**BLAZER v. BLACK.**

No. 4304.

United States Court of Appeals
Tenth Circuit.

March 19, 1952.

---

A. D. Weiskirch, Wichita, Kan., and Jack O. Brown, Chicago, Ill. (Fred Dobmeier, Buffalo, N. Y., and Manford Holly, Wichita, Kan., on the brief), for appellant.

George Siefkin, Wichita, Kan. (George B. Powers, Samuel E. Bartlett, Carl T. Smith, John F. Eberhardt, Stuart R. Carter, Robert C. Foulston, Jr., and Robert N. Partridge, all of Wichita, Kan., on the brief), for appellee.

Before PHILLIPS, Chief Judge, and BRATTON and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

This is a suit in the District Court of Kansas, by a former stockholder of a dissolved corporation, against its former president for compensatory and punitive damages for the alleged fraudulent conversion of the stockholder's stock before dissolution. At the conclusion of the plaintiff's case, the trial court sustained a motion for a directed verdict, and this appeal is from a judgment on that verdict.

The Black-Marshall Oil Company was organized under the laws of Illinois in 1940. It was authorized to do business in Kansas, and established its principal office in Great Bend, Kansas. Appellee, W. H. Black was one of its organizers and President. Dale Ives, an attorney at Aledo, Illinois, was also an incorporator and Secretary-Treasurer. More than 50,000 of the 200,000 shares of authorized common stock were sold to a group living in and around Aledo, where Black had lived and where Ives lived and practiced law. Herschel J. Blazer, a citizen of Aledo, and appellant here, owned 1150 shares of Black-Marshall stock. Stockholders meetings were held in Aledo, and Black came there from time to time to attend the stockholders meetings and report on the operations of the company, which was primarily engaged in drilling for and producing oil in Kansas.

As we construe and summarize the first amended complaint, it alleges that sometime in 1944, President Black devised a fraudulent scheme to acquire control of the stock of the Black-Marshall, including the appellant's stock, with the use of corporate funds; enter into an extensive drilling program, with borrowed funds, for the purpose of enhancing the value of the stock, and then sell the outstanding stock of the Company to the National Cooperative Refinery Association. In furtherance of that scheme, it is alleged that Black, acting through his agent Ives, induced the group

of stockholders in and around Aledo, and particularly this appellant, to deliver their stock to Ives, endorsed in blank, under the false pretense that Black-Marshall had been sold for an undisclosed amount, but for an amount sufficient to pay the stockholders $12 per share; that the company would retain undeveloped properties held by its wholly owned subsidiary, the Landowners Oil Association; that Black-Marshall would be dissolved and the stockholders would be issued stock in the Landowners Oil Association proportionate to their interest in Black-Marshall, or another corporation would be formed to develop the properties then held by Landowners, and stock would be issued to the Black-Marshall stockholders proportionately; that relying upon these representations, and believing that Black-Marshall had been sold as represented, this appellant delivered his 1150 shares to Ives, endorsed in blank, in September 1945, who accepted the same and delivered them to Black; that the appellant was paid the sum of $13,800, representing $12 per share for his stock, by a check on Black-Marshall; that at about the time of this transaction, and on October 1, 1945, Black, as president of Black-Marshall, entered into an agreement with the National Cooperative Refinery Association, under the terms of which the latter loaned Black-Marshall $3,200,000, in consideration of the assignment of certain designated properties of Black-Marshall; that the Association further agreed to loan Black-Marshall the sum of $22,000 for each producing well drilled on the properties conveyed to the Association, until a total of not to exceed $528,000 was advanced, said loan to be evidenced by notes, payable not later than five days from the date of the agreement.

It is alleged that in furtherance of the fraudulent scheme, approximately $1,000,000 of the $3,200,000 loaned to Black-Marshall was used by Black personally, to acquire the stock of the stockholders in Black-Marshall, and that Black caused Black-Marshall to commence an extensive drilling program, during which 100 wells were drilled, 70 per cent of which were commercial producers, thus greatly enhancing the value of Black's stock in the corporation. It is alleged that after acquiring approximately 68,000 shares of the outstanding stock of Black-Marshall, including the 1150 shares of the appellant, all in blank, Black placed the same in his private lock box in Great Bend, Kansas; that it remained there as street stock, paid for by Black-Marshall but charged to Black's personal stock account until 56,402.75 shares were marked retired on June 1, 1947, and the remaining outstanding stock of the corporation sold to the National Cooperative Refinery Association for $7,500,000. It is alleged that the 56,402.75 shares, including the appellant's 1150 shares, marked retired, were in fact outstanding stock at the time of the sale, and based upon the sale price, was worth $51.06 per share or $58,719 for the 1150 shares owned by the appellant.

It is specifically alleged that at all times material, Black and his agent Ives, as officers of the Company, were acting in a relation of trust and confidence, and as such required to deal with the stockholders, including this appellant, with the utmost fairness, and were required to communicate to the appellant all material facts bearing upon the transactions mentioned relating to the true financial condition of Black-Marshall, and that they purposely failed to disclose the information and concealed transactions in order to effect the fraudulent scheme. Appellant avers that he first learned of the sale of Black-Marshall during the forepart of 1948, and after an investigation discovered the fraud. A demand for restitution was refused, and this suit followed in the Fall of 1949. The prayer was for the difference between the $13,800.00 paid for the stock at $12 per share and $58,719, based upon a valuation of $51.06 per share. He further prayed for his proportionate interest in Landowners Royalty, which Black acquired at the time of the dissolution of Black-Marshall, for the sum of $52,000 and for $100,000 punitive damages.

On motion of the defendant, the trial court struck from the complaint all the allegations with respect to matters and events occurring subsequent to September 29, 1945, when appellant parted with his

stock and received $13,800 therefor. The court observed that while such allegations might be entirely proper in an action for rescission or in a proceedings to impress a trust upon funds in the hands of an unfaithful fiduciary, they had no place in a suit for money damages for fraud and deceit, citing Turner v. Jarboe, 145 Kan. 202, 64 P.2d 26. The court was further of the view that the measure of damages, if any, would be the difference between the price paid for the stock and its true value at the time of the transaction "if the latter exceeds the former", citing Hotchkiss v. Fischer, 139 Kan. 333, 31 P.2d 37, 38. Appellant was accordingly ordered to amend his complaint to conform to the ruling, or go to trial on the first amended complaint sans the stricken allegations.

The appellant filed a second amended complaint in which he reiterated the fraudulent scheme, the fiducial relationship, the fraudulent representations which induced him to part with his stock, and the discovery of the fraud in 1948. He prayed for the damages originally sought, based upon the "wrongful, deceitful, and fraudulent practices" perpetrated by the appellee Black through his own conduct and that of his agent Ives. In sum, the claim stated was substantially the same as the original claim, eliminating therefrom only the detailed facts and circumstances occurring subsequent to the transaction in which the appellant parted with his stock on September 29, 1945, and the final sale of the Company in June, 1947.

Black answered, specifically denying that Ives was his agent or that he made any representations to the appellant either personally or through Ives. He affirmatively alleges that Ives, acting in some capacity, unknown to him, did purchase for the Black-Marshall Company the appellant's stock for the sum of $13,800; that the check was cashed in full consideration of the purchase price and the stock assigned in blank; that the stock was purchased by the Company pursuant to a resolution of the Board of Directors, retired as company stock, and never reissued. He specifically denied ever representing to the appellant any facts relating to the affairs of Black-Marshall or the value of its stock, or that he ever received or claimed to own appellant's stock in the Company. He pleaded the two year statute of limitations and analogous laches.

On appeal, appellant has assigned as error the order of the court striking from his complaint the allegations of matters and events alleged to be part, or in furtherance, of the alleged fraudulent scheme. It is said that the court's ruling in that regard had the effect of converting his stated claim for damages based upon equitable conversion to one for damages for fraud and deceit. No objections are raised in appellee's brief to the consideration of this assignment of error on appeal, but at the bar of the court it is suggested that when appellant amended his complaint pursuant to the order of the court, he waived the right to stand upon the allegations of his first amended complaint, and must now stand or fall on the second amended complaint.

In some jurisdictions, where a pleader elects to plead over and files an amended statement of his claim, any error committed by the trial court in striking allegations from his former statement is waived. Reynolds v. Armour & Company, 149 Kan. 460, 87 P.2d 530; Harold v. Armour & Company, 151 Kan. 487, 99 P.2d 856; Northern Pac. R. Co. v. Murray, 9 Cir., 87 F. 648; Steiner v. Rowley, Cal. App., 214 P.2d 424, 426; Sinkey v. Temple Lumber Co., Tex.Civ.App., 131 S.W.2d 809; Wade v. Drinkard, 76 Ga.App. 159, 45 S.E.2d 231; Fry v. Hildreth, Ohio App., 99 N.E.2d 910; Smith v. Nauer, 338 Ill. App. 43, 86 N.E.2d 670. Other jurisdictions, while adhering to the general rule, recognize an exception under which the pleader does not waive his right to challenge the ruling on a motion to strike which leaves a question of fact in the pleadings. Sunset Oil Co. v. Vertner, 34 Wash.2d 268, 208 P.2d 906; Miller v. Sisters of St. Francis, 5 Wash.2d 32, 105 P.2d 32. It has long been the rule of Federal practice, even despite the Conformity Act, that while the pleader who amends or pleads over, waives his objections to the ruling of the court on indefiniteness, incompleteness or insufficien-

cy, or mere technical defects in pleadings, he does not waive his exception to the ruling which strikes "a vital blow to a substantial part" of his cause of action. Williamson v. Liverpool & London & Globe Ins. Co., 8 Cir., 141 F. 54.

 But, be that as it may, we need not decide whether the trial court erroneously sustained the motion to strike or whether appellant waived his right to question such ruling by pleading over, for we are certain that the second amended complaint, on which he went to trial, sufficiently stated a claim based upon a fraudulent scheme under color of a fiducial relationship, and evidence bearing upon that scheme from its inception to its consummation was relevant and admissible under the issues raised by the pleadings. See Annotation 57 A.L.R. 1142, at page 1150; Annotation 161 A.L.R. 316, at page 340. The appellant was not deprived of the gravamen of his claim by striking the allegations of detailed constituent facts. While the substantive right to recover on his claim is governed by state law, the form or mode of his claim for relief is a matter of Federal procedure, under which no technical forms of pleadings are required. Continental Collieries v. Shober, 3 Cir., 130 F.2d 631. Fed.Rules Civ.Proc. rule 8(e) (1), 28 U.S.C.A. Indeed, the only permissible pleading is a short and plain statement of the claim showing that the pleader is entitled to relief on any legally sustainable grounds. Rule 8(a) (2). Clyde v. Broderick, 10 Cir., 144 F.2d 348; Willoughby v. Sinclair Oil and Gas Company, 10 Cir., 188 F.2d 902. The appellant was at liberty to state as many separate claims as he wished "regardless of consistency", whether based upon legal or equitable grounds or both. Rule 8(e) (2); Automobile Ins. Co. of Hartford Conn. v. Barnes Manley Wet Wash Laundry Co., 10 Cir., 168 F.2d 381. And, since jurisdiction was unquestioned, the only permissible attack on the pleadings was a motion to dismiss for "failure to state a claim upon which relief can be granted". Rule 12(b) (6).

There was evidence to the effect that Ives had been a friend of, and legal advisor to appellant since 1939, and that he also was a friend and legal advisor to Black. Black visited in Ives' home when he came to Aledo. During one of the visits in 1941, there was a Black-Marshall meeting in the Merchants Hotel, at which Black discussed the Company's progress with appellant, telling him that he was unable to get back to Aledo as often as he liked but would keep him advised through Ives, who at that time was Secretary-Treasurer of the Company. Afterwards, appellant looked to Ives for his information about the company. In a stockholders' meeting in Aledo in 1944 there was a discussion about anticipated dividends or the sale of the Company. Black and Ives both expressed a desire to pay dividends but did not think it could be done because of the tax situation, and suggested that it might be wise to sell the Company. They stated that the Black-Marshall stock was worth a minimum of $8 per share and a stockholder's resolution was passed authorizing Black to sell the assets of the Company sufficient to yield the shareholders at least $8.00 per share, subject to the approval of the Board of Directors before any final sale was consummated.

In September 1945, Ives called appellant to his office. Upon arrival he was told that Ives had received a call from Black stating that Black-Marshall had been sold and they wanted to get the stock in so the sale could be completed. When asked for details of the sale, Ives stated "we are retaining leases that are not developed. We are retaining Landowners Association and the price will be $12 per share plus your prorata interest in what we retain." Thereafter appellant delivered his stock to Ives, endorsed in blank, and on September 29, 1945, Ives again called appellant to his office, handing him a check for $13,800 on the Black-Marshall Oil Company, by W. H. Black. When appellant expressed surprise that the check was issued by the Company, Ives stated "that is easily explainable. The Company is going to be held in abeyance two years on account of tax matters and the sale was made to Bill [Black] and Bill will be acting Trustee for a period of two years." Ives also spoke about Land-

owners and said it would be retained and that the Black-Marshall stockholders would own stock in it proportionate to their stock in Black-Marshall; that a new company would be formed to hold the undeveloped leases which "would be worth more than the producing properties that had been sold, after the two year period had elapsed." In the summer of 1947, appellant asked Ives what had been done with his stock and was told that it had been delivered to Black in Great Bend, Kansas. About the same time he also learned that Black-Marshall had not been sold in 1945, when he delivered his stock to Ives. He also learned that Black had acquired Landowners from Black-Marshall for the sum of $52,000, but was unable to learn what had become of the undeveloped acreage which Ives mentioned. In the forepart of 1948 he read in a New Mexico Oil Journal that Black-Marshall had been sold in 1947 for $7,500,000. He then employed attorneys to investigate the matter and later made demand upon Black to compensate him for the value of his stock at the time of the sale. When Black refused this suit was commenced.

There was further testimony to the effect that Ives acquired about 60,000 shares of Black-Marshall stock from the Aledo group of stockholders in 1944 and 1945. That this stock was delivered to him in blank and by him delivered to Black. Part of the stock was paid for by Black-Marshall checks; part of it by Ives' checks, with funds furnished him by Black. The record shows that on October 4, 1944, Black deposited $248,750 to Ives' account, and on November 7, 1944, $80,121.64, for the purpose of purchasing Black-Marshall stock. Ives also corroborated appellant's testimony to the effect that in the acquisition of this stock Ives represented to the Aledo group, including appellant, that the company was being sold to yield the stockholders at least $8 per share, and that it was necessary for Black to have control of the stock in order to consummate the sale, and stated that in making these representations to the Aledo stockholders he acted under Black's instructions.

In addition to the stock Black acquired through Ives in and around Aledo, he solicited and acquired other stock in Chicago, California and Oklahoma. All of this stock was endorsed in blank as "street stock", placed in his lock box, and charged to his personal stock account with Black-Marshall. The record shows without dispute that Black's stock account with Black-Marshall on July 1, 1946, amounted to $831,453.06. Prior thereto, and on October 1, 1945, Black negotiated a loan with National Cooperative Refinery Association in the amount of $3,200,000. A part of these funds was used to purchase stock of the Company for Black's account, and the remainder was used to develop the properties of the Company. None of the stockholders knew of this loan, nor did they know of the extensive and successful operations of the Company in Kansas. When in June, 1947, Black sold Black-Marshall to National Cooperative Refinery Association for $7,500,000 he held in his lock box 68,114.875 shares of Black-Marshall stock, all endorsed in blank as street stock. Upon the sale of the Company he marked 56,-400.875 shares retired. The other 11,714 shares were apparently sold to National Cooperative as outstanding stock belonging to Black. He settled his stock account on the Black-Marshall books in the sum of $831,-453.06 by simply balancing his account with the retired stock.

Black, called as a witness for appellant, did not deny purchase of the stock of the Aledo group and others with Company funds; that he charged the same to his personal account; and held it in his lock box as street stock until it was retired when the company was sold, or that he settled his account with Black-Marshall by the expedient of a bookkeeping transaction. He did deny, however, that he instructed Ives to make any representations to the stockholders concerning the sale or the terms on which it was to be made, or that Ives acted as his agent in the acquisition of the stock from the stockholders, especially the appellant. Black takes the position, consistently with his pleadings, that the stockholders around Aledo wanted to sell

their stock and that he endeavored to find a market for it. That he purchased the stock with Company funds for the Company, held it in his lock box until it was retired because he did not know just what disposition to make of it. He says that he did not inform any of the Aledo stockholders, including this appellant of the $3,200,000 loan from the National Cooperative Refinery Association, the successful development of the Company's oil properties, or the final sale of the Company in 1947, or of any other details of corporate affairs, because having sold their stock and having received a stated consideration therefor, it was of no interest to them and he owed them no duty in respect thereto.

The minutes of the stockholders' meeting on December 6, 1944, authorized Black as President of Black-Marshall to purchase the outstanding stock of the Company offered for sale at a price to be agreed upon by the Directors; and, the minutes of the meeting of the Board of Directors on October 4, 1945, authorized Black to purchase on behalf of the Company, the outstanding stock offered for sale for not to exceed $20 per share or loan any stockholder not to exceed $12 per share, with the stock as collateral. The resolution also provided that the purchase price or the loan on the stock should be taken from the assets of the Company and purchased for its account. There was testimony offered and excluded to the effect that in May 1947, and just before the sale of the Company in June, 1947, Black and his Great Bend attorney, went to Aledo with the minute book of the Company, and in Ives' office revised the minutes of the meetings so "they would not be objectionable". But, the evidence does not show just what changes were made or whether they were materially altered.

██ Kansas is an exponent of what is known as the minority rule to the effect that "Directors act in a fiduciary capacity in management of corporate affairs, and a director negotiating with a shareholder for purchase of shares acts in a relation of scrupulous trust and confidence. * * * such transactions must be subjected to the closest scrutiny, and, unless conducted with the utmost fairness, the wronged shareholder may invoke proper remedy." Hotchkiss v. Fischer, 136 Kan. 531, 16 P.2d 531, 535; Dalton v. Lawrence National Bank, 169 Kan. 401, 219 P.2d 719; Lyon v. Carey, 111 Kan. 470, 206 P. 1109; Stewart v. Harris, 69 Kan. 498, 77 P. 277, 66 L.R.A. 261; Fletcher Cyclopedia Corporations, Per.Ed.Vol. 3, § 1168.2, p. 793; Annotation 84 A.L.R. 615, at page 622. And, there are cogent reasons for applying that rule where the officers and directors of the corporation have peculiar knowledge of the condition and affairs of the Company—knowledge and information which is not readily available or imparted to the stockholders.

Here, a large block of stock was sold to a group of investors in and around Aledo, Illinois, through personal contact and apparently through their personal relationship with Black and Ives. The Company operated in Kansas. The stockholders knew very little, if anything, about the affairs or condition of the Company—they relied upon Black and Ives. They were anxious to realize a return upon their investment. Black advised against declaring a dividend because of the tax situation. Under the evidence, this appellant parted with his stock in September, 1945, with the understanding that properties of the company were being sold for an amount sufficient to yield $12 per share. He understood that valuable properties were being retained and that Black would act as Trustee for the stockholders until a new company was formed in which the stockholders would participate prorata. The properties of the Company were not sold in 1945 as represented. Instead, Black negotiated a large loan, a part of which he used to develop the Company's holdings and the company prospered. He used other Company funds to purchase the stock and charged himself with the stock on the books of the Company. The corporate records were maintained at Great Bend, Kansas. Ives, the Secretary-Treasurer knew very little about corporate affairs. After the stock of the Company was greatly enhanced in value by the development of its holdings, it was sold. A sufficient amount of the stock which had remained in Black's lock

box for nearly two years was retired to settle his account with the Company and the remainder was sold to yield Black $51.-06 per share.

 Of course, if the appellant's stock was sold to the Company in 1945, in a free and open transaction, untainted by fraud, he was no longer a stockholder in the Company and neither Black nor Ives owed him any duty to impart information concerning corporate affairs or to in any way account for their stewardship as corporate officers. But, we think the evidence susceptible of an inference that Black did devise a scheme to defraud the stockholders of Black-Marshall, including this appellant, in 1944 and 1945, as alleged; that the scheme was not finally consummated until the Company was sold in 1947, and that Ives was Black's agent in the perpetration of that scheme. If having devised such scheme, he became the Trustee for the stockholders and equity will impress a trust and require him to account for the profits realized from the ultimate sale of the Company.

 While the trial court gave no reasons for directing the verdict, its ruling on the first amended complaint and citation of Turner v. Jarboe, 145 Kan. 202, 64 P. 2d 26, indicate it is based upon the hypothesis that the prayer for a money judgment was inconsistent with a claim for equitable relief and that the appellant's claim was therefore restricted to a money judgment for fraud and deceit at the time of the delivery of the stock. It is true that appellant prayed for money damages, but the legal dimensions of his claim are measured by what he pleaded and proved—not his prayer. The court was not warranted in dismissing the action unless upon the facts and law he had shown no right to relief in law or equity. Rule 54(c). Preas y. Phebus, 10 Cir., 195 F.2d 61; Schoonover v. Schoonover, 10 Cir., 172 F.2d 526; Garland v. Garland, 10 Cir., 165 F.2d 131; Hawkins v. Frick-Reid Supply Corp., 5 Cir., 154 F.2d 88; Kansas City, St. L. & C. R. Co. v. Alton R. Company, 7 Cir., 124 F.2d 780.

We think the trial court not only too narrowly construed appellant's pleadings, but unduly restricted his right to relief thereunder.

 Neither the statute of limitations nor analogous laches would bar the claim until two years after discovery of the alleged fraud. There is proof to the effect that appellant did not learn of the sale until the forepart of 1948. In any event, a claim is not barred in equity unless it is inequitable to enforce it. Oldland v. Gray, 10 Cir., 179 F.2d 408; Chisholm v. House, 10 Cir., 183 F.2d 698.

The judgment is reversed and the case remanded with directions to proceed in accordance with the views herein expressed.