**John M. WILSON, Plaintiff-Appellant,**

v.

**FIRST HOUSTON INVESTMENT CORPORATION et al., Defendants-Appellees.**

No. 75-3422.

United States Court of Appeals, Fifth Circuit.

Feb. 2, 1978.

Rehearing and Rehearing En Banc Denied March 7, 1978.

Joel H. Pullen, San Antonio, Tex., for plaintiff-appellant.

Brice A. Tondre, Houston, Tex., for First Houston Investment, Walser, Allgood and Barker.

Before GODBOLD, TJOFLAT and HILL, Circuit Judges.

GODBOLD, Circuit Judge:

This is an appeal from the dismissal of plaintiff's suit against his investment adviser, which plaintiff sought to bring under the Investment Advisers Act of 1940, § 214, 15 U.S.C. § 80b–14 (1970) (the "IAA"), as well as Rule 10b–5, 17 C.F.R. 240.10b–5 (1977). The district court dismissed plaintiff's complaint and first amended complaint, and plaintiff appealed.

The plaintiff alleged the following facts, drawn largely from his amended complaint. For a number of years he had maintained a stock portfolio. He became dissatisfied with his investment advisers. He became interested in First Houston Investment Corporation[1] after reading two magazine articles which purported to describe its investment management techniques. In particular the articles represented that First Houston utilized a system of computer analysis of the market and promptly eliminated stocks not meeting certain performance standards.

Plaintiff met with a representative of First Houston who stated that the magazine articles were accurate. As a result of these representations plaintiff executed a power of attorney giving First Houston full discretionary authority to manage plaintiff's stock portfolio, then valued at $104,-358. First Houston assumed management of plaintiff's portfolio in March of 1972 and immediately converted all of his stocks into securities of its own choosing. In September 1973 First Houston notified plaintiff that it was resigning from management of the account because the account had become too small. The account was then worth $5,441 and included 1000 shares of Teleprompter stock, trading of which had been suspended. At no time did First Houston reveal to the plaintiff that the computer analysis system was no longer being used or that it had never been fully utilized.

In his original complaint plaintiff sought to assert an implied right of action for damages under the IAA and a Rule 10b–5 claim as well. Motion to dismiss for lack of subject matter jurisdiction was granted. The trial court reasoned that a private right of action should not be implied under the IAA and that the complaint failed to allege a valid 10b–5 claim.[2]

Plaintiff was given leave to file an amended complaint, and he did so, again attempting to state a 10b–5 claim. However, he did not reassert his claim under the IAA, nor did he incorporate by reference the allegations of the original complaint. First Houston's motion to dismiss the amended complaint was granted.

I.

Plaintiff did not waive his right to appeal the order dismissing his claim under the IAA by filing an amended complaint which failed to make reference to that alleged cause of action. As a general rule an

1. The defendants are First Houston Investment and three of its employees.

2. The trial court stated that it was dismissing for lack of subject matter jurisdiction. According to the district court's analysis, the complaint more properly should have been dismissed for failure to state a claim upon which relief can be granted. See Mobil Oil Corp. v. Kelley, 493 F.2d 784, 786 (CA5), cert. denied, 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974). As pertains to the asserted cause of action under the IAA, general federal question jurisdiction is conferred by 28 U.S.C. § 1331 (1970). See Abrahamson v. Fleschner, No. 75–7203, 568 F.2d 862, at 880 n. 5 (CA2 1977) (the dissent and majority agree on this point). See generally Note, Implying Civil Remedies from Federal Regulatory Statutes, 77 Harv.L. Rev. 285, 287 (1963) (two possible theories of jurisdiction).

amended complaint supersedes and replaces the original complaint, unless the amendment specifically refers to or adopts the earlier pleading. *La Batt v. Twomey*, 513 F.2d 641, 651 (CA7 1975); *Cedillo v. Standard Oil Co. of Texas*, 261 F.2d 443 (CA5 1958). *See also* 6 Wright & Miller, Federal Practice and Procedure: Civil § 1476 (1971); 3 Moore's Federal Practice ¶ 15.08[7] (1974). But we hold that plaintiff, by filing an amended complaint after a dismissal with leave to amend, was not barred from raising on appeal the correctness of the dismissal order.

A rule that a party waives his objections to the court's dismissal if he elects to amend is too mechanical and seems to be a rigid application of the concept that a Rule 15(a) amendment completely replaces the pleading it amends. Without more, the action of the amending party should not result in completely denying him the right to appeal the court's ruling. By way of contrast, if the motion to dismiss is denied and defendant answers and defends on the merits, he still retains the right to object to the denial of his motion to dismiss on an appeal from the ultimate judgment. Similar principles apply to plaintiff when he unsuccessfully moves to strike a defense as legally insufficient and later serves a reply by order of the court. It therefore is not logical to deny a party the right to appeal simply because he decides to abide by the court's order and amend his pleading rather than allowing judgment to be entered against him and taking an immediate appeal. 6 Wright & Miller, Federal Practice and Procedure: Civil § 1476, at 393 (1971) (footnotes omitted). The authors refer with approval to the approach suggested in *Blazer v. Black*, 196 F.2d 139, 143–44 (CA10 1952) (citation omitted):

> [W]hile the pleader who amends or pleads over, waives his objections to the ruling of the court on indefiniteness, incompleteness or insufficiency, or mere technical defects in pleadings, he does not waive his exception to the ruling which strikes "a vital blow to a substantial part" of his cause of action.

There is authority to the contrary,[3] but such an approach spawns piecemeal appeals. We hold that the question whether a private right of action should be implied under the IAA is properly before us on appeal.

## II.

■ The broad antifraud provision of the IAA, § 206,[4] makes no express provision for a private right of action for damages. But this alone does not preclude the recognition of a private right of action. *See, e. g., Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730, 95 S.Ct. 1917, 1922, 44 L.Ed.2d 539, 546 (1975); *J. I. Case Co. v. Borak*, 377 U.S. 426, 432, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423, 427 (1964). The question is whether

---

3. *Loux v. Rhay*, 375 F.2d 55, 57 (CA9 1967). *See also Sacramento Coca-Cola Bot. Co. v. Chauffeurs Local 150*, 440 F.2d 1096, 1098 (CA9), *cert. denied*, 404 U.S. 826, 92 S.Ct. 57, 30 L.Ed.2d 54 (1971).

4. 15 U.S.C. § 80b–6 (1970) provides:

"It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

"(1) to employ any device, scheme, or artifice to defraud any client or prospective client;

"(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;

"(3) acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction. The prohibitions of this paragraph shall not apply to any transaction with a customer of a broker or dealer if such broker or dealer is not acting as an investment adviser in relation to such transaction;

"(4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. The Commission shall, for the purposes of this paragraph (4) by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative."

the implication of the cause of action is necessary to achieve the goals of Congress in enacting the legislation. *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 26, 97 S.Ct. 927, 941, 51 L.Ed.2d 124, 143 (1977). In *Abrahamson v. Fleschner*, No. 75–7203, 568 F.2d at 862 (CA2 1977), a majority of the panel held that a private cause of action for damages should be implied under the IAA. Judge Gurfein filed a strong dissent. Prior to *Abrahamson* this question had been considered by several district courts. *Angelakis v. Churchill Management Corp.*, [1975–1976 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,285 (N.D.Cal.1975) (cause of action implied); *Bolger v. Laventhol, Krekstein, Horwath & Horwath*, 381 F.Supp. 260 (S.D.N.Y.1974) (cause of action implied); *Greenspan v. del Toro*, No. 73–638 CIV JE (S.D.Fla. May 17, 1974) (no right of action), *appeal dismissed for want of prosecution*, No. 74–2943 (CA5 Sept. 5, 1974); *Gammage v. Roberts, Scott & Co.*, [1974–1975 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,760 (S.D.Cal.1974) (no right of action). *See also* Note, *Private Causes of Action Under Section 206 of the Investment Advisers Act*, 74 Mich.L.Rev. 308 (1975).

In *Piper v. Chris-Craft Industries, Inc.*, the Supreme Court was presented with the question whether a cause of action for damages should be implied under § 14(e) of the Securities Exchange Act of 1934, as amended by the Williams Act of 1968, 15 U.S.C. § 78n(e) (1970), in favor of an unsuccessful tender offeror who alleged that his bid for corporate control failed as a result of fraud on the part of the successful tender offeror and various other individuals. Chief Justice Burger, writing for the majority, noted that:

> [W]here congressional purposes are likely to be undermined absent private enforcement, private remedies may be implied in favor of the particular class intended to be protected by the statute.

430 U.S. 1, 25, 97 S.Ct. 927, 941, 51 L.Ed.2d 124, 143 (1977). Having so stated the Court applied the following methodology in deciding the question:

Once we identify the legislative purpose, we must then determine whether the creation by judicial interpretation of the implied cause of action asserted by Chris-Craft is necessary to effectuate Congress' goals.

*Id.* The Court examined the legislative history of the Williams Act and determined that Congress had intended to protect the shareholders of target companies by regulating takeover bidders. Chris-Craft, the defeated tender offeror, was not a member of the class Congress sought to protect. Consequently an implied right of action in favor of Chris-Craft was not necessary to effectuate Congress' goals.

The Court confirmed this conclusion by applying the analysis of *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). *Cort* set out four relevant factors to be considered in deciding whether to infer a private remedy:

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," *Texas & Pacific R. Co. v. Rigsby*, 241 U.S. 33, 39, 36 S.Ct. 482, 60 L.Ed. 874 (1916) (emphasis supplied)—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? See, *e. g.*, *National Railroad Passenger Corp. v. National Assn. of Railroad Passengers*, 414 U.S. 453, 458, 460, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974) (*Amtrak*). Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? See, *e. g.*, *Amtrak, supra; Securities Investor Protection Corp. v. Barbour*, 421 U.S. 412, 423, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975); *Calhoon v. Harvey*, 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964). And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? See *Wheeldin v. Wheeler*, 373 U.S. 647, 652, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963); cf. *J. I. Case Co. v. Borak*, 377 U.S. 426, 434, 84

S.Ct. 1555, 12 L.Ed.2d 423 (1964); *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 394–395, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *id.,* at 400, 91 S.Ct. 1999 (Harlan, J., concurring in judgment).

*Id.* at 78, 95 S.Ct. at 2088, 45 L.Ed.2d at 36–37. The Court in *Piper* found that: (1) the plaintiff was not a member of the class "for whose *especial* benefit the statute was enacted . . . "; (2) the legislative history supported the conclusion that Congress did not intend to imply a private right of action in favor of tender offerors; (3) it was not consistent with the underlying legislative purpose to imply such a right in favor of Chris-Craft; and (4) it was appropriate to relegate the plaintiff to whatever remedy is created by state law. 430 U.S. at 37–41, 97 S.Ct. at 947–949, 51 L.Ed.2d at 150–53.

In addition to applying the *Cort* factors the Court considered whether, in view of potential impact on shareholders, there was a less drastic means available for achieving the congressional goal.

> In short, we conclude that shareholder protection, if enhanced at all by damages awards such as Chris-Craft contends for, can more directly be achieved with other, less drastic means more closely tailored to the precise congressional goal underlying the Williams Act.

*Id.* at 40, 97 S.Ct. at 949, 51 L.Ed.2d at 152–53.

> Nor can we agree that an ever-present threat of damages against a successful contestant in a battle for control will provide significant additional protection for shareholders in general. The deterrent value, if any, of such awards can never be ascertained with precision. More likely, however, is the prospect that shareholders may be prejudiced because some tender offers may never be made if there is a possibility of massive damages claims for what courts subsequently hold to be an actionable violation of § 14(e). Even a contestant who "wins the battle" for control may well wind up exposed to a costly "war" in a later and successful

defense of its victory. Or at worst—on Chris-Craft's damage theory—the victorious tender offeror or the target corporation might be subject to a large substantive judgment, plus high costs of litigation.

*Id.* at 39, 97 S.Ct. at 948, 51 L.Ed.2d at 152 (footnote omitted).

We turn to consideration of the *Cort* factors with the gloss of *Piper,* as they apply to the present case.

### A. *"Class for whose* especial *benefit the statute was enacted . . . ."*

The crucial shortcoming of the plaintiff's case in *Piper* was that plaintiff was not a member of the protected class. In the instant case, the plaintiff is a member of the class of intended beneficiaries of the IAA.

> In the opinion of the committee, the Securities and Exchange Commission, and the industry itself, this legislation is needed to protect small investors from breaches of trust upon the part of unscrupulous managements and to provide such investors with a regulated institution for the investment of their savings.

H.R.Rep.No. 2639, 76th Cong., 3d Sess. 10 (1940). This same theme appears in S.Rep.No. 1775, 76th Cong., 3d Sess. 21 (1940):

> The nature of the functions of investment advisers, their increasing widespread activities, their potential influence on security markets and the dangerous potentialities of stock market tipsters imposing upon unsophisticated investors, convinces this committee that protection of investors requires the regulation of investment advisers on a national scale.

### B. *"Legislative intent . . . to create such a remedy. . . ."*

Our understanding of the legislative purpose is consistent with the reading given it by the Supreme Court in *S. E. C. v. Capital Gains Research Bureau,* 375 U.S. 180, 186–92, 84 S.Ct. 275, 279–283, 11 L.Ed.2d 237, 243–46 (1963):

> Although certain changes were made in the bill following the hearings, there is

nothing to indicate an intent to alter the fundamental purposes of the legislation. The broad proscription against "any . . practice . . . which operates . . as a fraud or deceit upon any client or prospective client" remained in the bill from beginning to end.

*Id.* at 191, 84 S.Ct. at 282, 11 L.Ed.2d at 246.

The appellees argue that the omission of the phrase "actions at law" from the jurisdictional section of the Act is strong evidence that Congress did not intend to authorize federal jurisdiction over a private cause of action for damages.[5] The jurisdictional provisions of other securities acts specifically provide for jurisdiction over "actions at law".[6] Judge Gurfein emphasized this point in his dissent in *Abrahamson*.

But the more cogent question is why the Advisers Act as distinguished from every other securities act, does not provide for *any express* civil liability in damages. The majority offers no explanation for such an omission which must have been a studied omission. I think it is highly relevant that in *each* of the other Acts Congress itself did provide for some *express* civil liability, yet under the Advisers Act it failed to include a single section imposing liability for damages. Congress, for example, could have provided an express damage remedy for misrepresentations in the registration statement of the advisers as it did for misrepresen-

tations of the registration statement of the underwriter, 15 U.S.C. § 77k(a)(5). This indicates rather that, in its cautious approach to the regulation of investment advisers, Congress was not yet ready to impose *any* civil liability for damages.

568 F.2d at 881 (emphasis in original). An equally persuasive argument can be made that Congress omitted the "actions at law" language from the general jurisdictional section because the Act does not contain any express provision authorizing a private party to bring a civil action for damages. This rationale was accepted by the majority in *Abrahamson* and in *Bolger v. Laventhol, Krekstein, Horwath & Horwath*, 381 F.Supp. 260, 264–65 (S.D.N.Y. 1974). The court in *Bolger* stated:

[A] plausible explanation exists for the hiatus in the language in this statute. Unlike each of the other securities laws, the Advisers Act does not contain *any* provision *expressly* authorizing a civil action by a private person injured by a violation of one of the provisions of the Act. Accordingly, it was necessary in those statutes to make reference to "actions at law" in the jurisdictional sections. Such a provision was unnecessary in the Advisers Act.

*Id.* at 264–65 (footnote omitted). Judge Gurfein's dissent in *Abrahamson* took exception to this analysis:

---

**5.** Section 214 of the Act states:

"The district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have jurisdiction of violations of this subchapter or the rules, regulations, or orders thereunder, and, concurrently with State and Territorial courts, *of all suits in equity* to enjoin any violation of this subchapter or the rules, regulations, or orders thereunder. Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enjoin any violation of this subchapter or rules, regulations, or orders thereunder, may be brought in any such district or in the district wherein the defendant is an inhabitant or transacts business, and process in such cases may be served in any district of which the defendant is an inhabitant or transacts business or wherever the defendant may be found. Judg-

ments and decrees so rendered shall be subject to review as provided in sections 225 and 347 of Title 28, and section 7, as amended, of the Act entitled "An Act to establish a court of appeals for the District of Columbia", approved February 9, 1893. No costs shall be assessed for or against the Commission in any proceeding under this subchapter brought by or against the Commission in any court."

15 U.S.C. § 80b–14 (1970) (emphasis added).

**6.** The "actions at law" language is found in the following provisions: §§ 11 and 12 of the 1933 Securities Act, 15 U.S.C. §§ 77k and 77*l* (1970); §§ 9(e), 16(b) and 18 of the 1934 Securities Exchange Act. 15 U.S.C. §§ 78i(e), 78p(b), 78r (1970); §§ 16(a) and 17(b) of the Public Utility Holding Co. Act of 1935, 15 U.S.C. §§ 79p, 79q (1970); § 30(f) of the Investment Company Act of 1940, 15 U.S.C. § 80a–29(f) (1970).

The reason given by the majority is not persuasive, for it fails to note that in every single case in which an express civil liability is created in *any* of the Acts, the jurisdiction has *already* been stated in the very section creating the express liability. . . . The better explanation, it seems to me, for the general jurisdictional provision in each Act . . . is Congress' fear that general federal question jurisdiction under 28 U.S.C. § 1331 might not establish jurisdiction in the *federal* courts over securities law claims, particularly when the jurisdictional amount was lacking.

568 F.2d at 881 n.6 (emphasis in original).

The dissent in *Abrahamson* also attached significance to the absence of any section of the IAA that imposes liability for damages. *Id.* 568 F.2d at 881. The dissent reasoned that the omission of a section imposing liability for damages suggested that Congress, in a cautious approach to the regulation of investment advisers, was not yet ready to impose civil liability for damages. *Id.* 568 F.2d at 881. While this presentation of the former of our two choices is plausible it is no more persuasive than the reading given this matter by the majority in *Abrahamson*. We get no substantial assistance from the legislative history with respect to Congress' intentions.

C. *"Consistent with the underlying purposes of the legislative scheme. . . ."*

As we have previously stated, Congress sought to protect investors from the "problems and abuses of investment advisory services" by regulation of the industry. S.Rep. No. 1775, 76th Cong., 3d Sess. 21 (1940). The concept of implying a private right of action for damages in favor of investors injured by violations of the Act is consistent with the remedial purposes contemplated by Congress.

In *Piper* the Supreme Court reasoned that "the Williams Act cannot consistently be interpreted as conferring a monetary remedy upon *regulated parties* . . . ." 430 U.S. at 39, 97 S.Ct. at 948, 51 L.Ed.2d at 152. Again the reasoning of *Piper* simply does not apply to the instant case where plaintiff is a member of the protected class.

D. *"The cause of action [is] one traditionally relegated to state law. . . ."*

The area of activity in question is not one, in the language of *Cort*, "[so] basically the concern of the States . . . that it would be inappropriate to infer a cause of action based solely on federal law." 422 U.S. at 78, 95 S.Ct. at 2088, 45 L.Ed.2d at 36. Federal regulation of the securities industry is very broad. An investor had little common law protection against his adviser.

The Investment Advisers Act of 1940 was the last in a series of Acts designed to eliminate certain abuses in the securities industry, abuses which were found to have contributed to the stock market crash of 1929 and the depression of the 1930's. . . . A fundamental purpose, common to these statutes, was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry. *S. E. C. v. Capital Gains Research Bureau,* 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237, 243 (1963). In that case the Court examined the relation between its interpretation of the IAA and common law of fraud. The Court pointed out that its conclusion—that injunctive relief was available without proof of intent to injure or evidence of actual injury—was not in derogation of the common law. *Id.* at 192, 84 S.Ct. at 283, 11 L.Ed.2d at 246. As pertains to our inquiry, the Court went on to note:

There has also been a growing recognition by common-law courts that the doctrines of fraud and deceit which developed around transactions involving land and other tangible items of wealth are ill-suited to the sale of such intangibles as advice and securities, and that, accordingly, the doctrines must be adapted to the merchandise in issue.

*Id.* at 194, 84 S.Ct. at 284, 11 L.Ed.2d at 248.

E. *The factors applied.*

We do not find in the present case the less drastic and more closely tailored means

for achieving the congressional goal which the Court found in *Piper.* Nor do we foresee that recognition of a private right of action for damages is likely to cause investment advisers not to offer their services to the public.

■ Thus we arrive at the ultimate question whether it is necessary to imply the cause of action to achieve the goals of Congress. We conclude that it is. Plaintiff is a member of the benefited class; the recognition of an aggrieved investor's private right of action for damages is consistent with the underlying purposes of the legislative scheme; the cause of action is not one traditionally within the province of state courts; and legislative intent either to create or deny such a cause of action is a neutral factor. Congress sought to protect investors such as the plaintiff who have relied on the advice of investment advisers, from the possibility of overreaching and fraudulent conduct on the part of investment advisers. To deny investors a right of action for damages incurred as a direct result of fraudulent advisory practices would undermine this purpose. We find additional support in the language of the Supreme Court in *S. E. C. v. Capital Gains Research Bureau*:

> Congress intended the Investment Advisers Act of 1940 to be construed like other securities legislation "enacted for the purpose of avoiding frauds," not technically and restrictively, but flexibly to effectuate its remedial purposes.

375 U.S. at 195, 84 S.Ct. at 284, 11 L.Ed.2d at 248. Finally, we perceive neither a less stringent means to achieve the congressional goal nor serious adverse impact on investors by implying the cause of action.

### III.

■ The trial court was correct in dismissing plaintiff's Rule 10b–5 claims.

Plaintiff advances two theories to this court. The first is that transfer of control over his stock portfolio somehow satisfied the requirement that the alleged fraud be "in connection with the purchase and sale of securities."[7] We believe that any purchase and sale which took place incident to this arrangement was too remote to satisfy the "in connection with the purchase and sale" requirement as contemplated by *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

■ Plaintiff's second theory is that the contractual arrangement with First Houston constituted an investment contract and therefore was a security under *S. E. C. v. Howey Co.,* 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–1103, 90 L.Ed. 1244, 1249–50 (1946). This contention was made in a proposed second amended complaint which was never filed. It was not properly before the trial court and consequently is beyond the scope of this appeal.[8]

The judgment of the trial court is AFFIRMED in part and REVERSED in part and the cause is REMANDED.

HILL, Circuit Judge, dissenting:

My brothers in the majority today have found that a private right of action exists where the United States Congress has failed to provide for one. Finding this inappropriate for several reasons, I dissent.

The Act here under investigation is the last of a series of measures designed to provide some regulation in the field of securities and similar investments. It differs noticeably from the others. The Investment Advisers Act of 1940 was designed, largely, to provide a mechanism for the Congress to obtain information about what was, at the time of enactment, a relatively new industry. 15 U.S.C.A. §§ 80b–1—80b–21. Implicit in a measure calculated to

---

**7.** On appeal plaintiff contends that the right to make purchases and sales was secured as a result of the fraud. In his complaint he pursued a slightly different approach, arguing that the purchase and sale requirement was satisfied when the defendants immediately sold all of his securities upon assuming management of his portfolio.

**8.** Whether on remand plaintiff can amend to raise this is in the discretion of the district court. Fed.R.Civ.P. 15(a).

gather information is the intention of the Congress, when equipped with full information, to legislate further if the information thus obtained indicated a need for regulation. The Congress may have concluded that mandating a code of conduct and dealing which would be enforced by the Securities and Exchange Commission through penalties, injunctions, and the like, would be sufficient. The Congress may yet conclude that the industry would be better policed if those dealing with members of that industry have a private right of action against advisers violating the law. In any event, it is appropriate that the legislative branch make such a decision.

No legislation states that a person shall have a right of action in the federal courts under these circumstances. Yet, eminent jurists of the United States Court of Appeals for the Second Circuit have, like my brothers today, discovered the need for a private cause of action and, in a gesture somewhat patronizing of the Congress, have determined to complete the work of that body by reading one into the Act. *Abrahamson v. Fleschner*, 568 F.2d 862 (2d Cir. 1977). Perhaps the Congress should pass a law providing what my brothers find to be needed. If so, and if the inaction of the Congress leaves a void, that is regrettable.

It may be that sovereignty, like nature, abhors a vacuum. In nature, molecules of gasses mindlessly rush in to fill and destroy any vacuum that occurs. But in the political sciences and the governing arts, those of us who might be tempted to fill a vacuum are not mindless. We are given reason by which we may determine, for ourselves, whether one branch of the Government should rush into the province of another when the inaction of the other seems to create a vacuum. More than one-hundred and eighty years ago, Alexander Hamilton labeled the judiciary "the least dangerous branch" of government because it ". . . has no influence over either the sword or the purse, no direction of either the strength or of the wealth of the society, and can take no active resolution whatever. It may be truly said to have neither Force nor Will, but merely judgment; and must ultimately depend upon the aid of the executive arm even for the efficacy of its judgments." Cooke, J. (ed.), The Federalist 522–23 (1961). As for me, I should rather leave the abhorrent vacuum than to breach the separation of powers so wisely mandated in our Constitution. I have no yearning to be patronizing of the distinguished men and women who serve in the United States House of Representatives and the United States Senate. If the need exists for a private right of action so that "private attorneys general" may help enforce the Investment Advisers Act of 1940, our Congress is quite sufficient to the task of meeting it. Even were it to be found that the Congress has attempted to abdicate this part of its legislative function to the courts, I feel that proper concern for the Constitution requires that we decline the invitation to assist in such an inappropriate way.

It may be that the Act now created by our Court is a better or more complete Act than the one actually passed by the Congress. Who knows? Its deficiency is that the judicially created Section, establishing a private cause of action, was never submitted to the people's elected representatives and adopted by them. Unlike the judiciary, the legislative branch does its work through open debate, negotiation and, often, compromise. Portions of the Investment Advisers Act of 1940 which were enacted may have been obtained at the cost of leaving out any private cause of action for damages. If so, we might even assume that no act would have passed had that compromise not been effected.[1] This possi-

---

1. Facially desirable proposals may fail because they are seen to have undesirable "side effects." Somewhat analogous is the assertion now being made by, and on behalf of, the Courts that the Congress has created jurisdiction in the federal courts to hear and determine a host of disputes in areas that ought not require an Article III court for their resolution. This tendency has resulted in overburdening the courts to the detriment of the quality of justice available to those litigants whose causes ought properly be before those courts. A Sen-

bility pretermits "judicial-legislating," a constitutional contradiction in terms. Suffice it to say that I am in complete agreement with Judge Gurfein's concurring and dissenting opinion in *Abrahamson v. Fleschner, supra* 568 F.2d at 879, concerning the impropriety of implying a private cause of action in these circumstances.

So, I respectfully dissent.

ator or Member of the House, heeding such warnings, might resolutely oppose an otherwise well intended measure that would add to our burden. My brothers today offer him no encouragement by, themselves, creating a new federal cause of action which the Congress never provided. It may be that what we do speaks so loudly that no one will hear what we say.