In the

# United States Court of Appeals
## For the Seventh Circuit

-----

No. 12-3768

HEALIX INFUSION THERAPY, INCORPORATED,

*Plaintiff-Appellant,*

*v.*

HEARTLAND HOME INFUSIONS, INC., doing business as HHI Infusion Services,

*Defendant-Appellee.*

-----

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10 C 3772 — **James B. Zagel**, *Judge.*

-----

ARGUED MAY 28, 2013 — DECIDED AUGUST 16, 2013

-----

Before EASTERBROOK, *Chief Judge*, and WILLIAMS and HAMILTON, *Circuit Judges.*

EASTERBROOK, *Chief Judge*. Healix Infusion Therapy, Inc., and HHI Infusion Services compete in the infusion therapy services business. Infusion therapy is the administration of substances such as pharmaceuticals intravenously or by any method other than ingestion. Some medical care providers wish to offer these services to patients in the office of their

medical practice. For instance, an oncologist's office might have an area where patients can receive intravenous chemotherapy. Healix and HHI provide support: premixed pharmaceuticals, nurses to administer the drugs, billing services, and other necessities of an in-office infusion therapy center. Their customers are physicians and medical practices.

In June 2007 Healix recruited 3 Tree Infectious Disease Clinic, LLC (the Clinic), a medical practice in Burien, Washington, as a new customer. The Clinic had two members: David Keller, a physician, and Chris Porter, a nurse practitioner. Healix and the Clinic signed a five-year contract, under which Healix would provide infusion services after the Clinic built an in-office pharmacy and hired staff to work there. The Clinic was responsible for the expense of constructing the pharmacy. Healix required Keller and Porter to execute personal guarantees, and it took a security interest in some of the Clinic's accounts receivable.

The arrangement did not last long. Four months after signing the contract, the Clinic sent a letter informing Healix that it would not fulfill its responsibilities. The contract does not allow termination at will; HHI does not contest Healix's assertion that the Clinic was in breach—though Healix did not sue the Clinic or seek a remedy outside of the judicial system. One month after sending this letter, the Clinic entered into a contract for infusion services with HHI. The two businesses first met at the Infectious Disease Society Association's annual conference in October 2007. Porter spoke with Landon Lackey, one of HHI's employees, at its booth and later at a cocktail party HHI had organized.

When Healix found out that the Clinic had signed with a rival, it sued HHI for copyright and trademark infringement

and for tortious interference with a contract. The intellectual-property claims were dismissed. The tortious-interference claim continued. (The district judge could not send it to state court under 28 U.S.C. §1367(c), because the parties meet the requirements of the diversity jurisdiction.) The parties agree that the tort claim is governed by Texas law. The court held a bench trial and ruled against Healix.

Healix maintained at trial that, during the October 2007 conference, Lackey either learned that Healix had a contract with the Clinic or learned facts that would have led a reasonable person in his position to conclude that a contract existed. Despite that knowledge, Healix contended, Lackey and HHI sought the Clinic's business, offering a contract that did not require the Clinic to build an in-office pharmacy, hire additional employees, or provide personal guarantees. The Clinic took HHI's offer, which on balance was superior to Healix's, and broke its promise to Healix.

Under Texas law, to demonstrate tortious interference with a contract Healix must show "(1) that a contract subject to interference exists; (2) that the alleged act of interference was willful and intentional; (3) that the willful and intentional act caused damage; and (4) that actual damage or loss occurred." *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997). If the facts are as Healix narrates them, it might have a good claim for tortious interference with a contract. Its problem, however, is that the district judge did not find the facts to be so.

Healix presented three main kinds of evidence: first, the testimony of Porter, who said that he told Lackey about the contract at the October 2007 conference; second, the UCC statement that Healix filed with Washington's Secretary of

State; third, Lackey's testimony. Lackey was called as an adverse witness and professed not to remember what he talked about with Porter at the conference. HHI's main evidence was the testimony of Healix's other owner, David Keller, who stated that an in-office pharmacy would have been too costly. The district court found that Healix "would not have performed under the contract under any circumstances … [because] Keller was profoundly uncomfortable with the financial obligations imposed by the contract and he would not do what he needed to do to make the deal with Healix work". 2012 U.S. Dist. LEXIS 169376 at *4–5 (N.D. Ill. Nov. 29, 2012). HHI also called Neil Stanton, who attended the October 2007 conference with Lackey and expressed confidence that he would remember whether Porter told him about having a contract with Healix; he had no recollection of it.

The district judge found Porter's testimony not credible: "Porter's demeanor was unusual and his mannerisms disclosed many of the classic indicia of untruthfulness. I conclude from my observation of Porter's demeanor that he had significant blanks in his recollection, which he tried to fill in by telling a story of what might have happened." *Id*. at *4. As we have mentioned, the judge did believe Keller. In addition to its credibility findings, the court found that the financing statement did not alert HHI to the contract's existence.

Healix contends that the judge made three errors. Without them, it argues, the district court should have found that HHI tortiously interfered with its contract. First, Healix argues, the court misapplied Texas law by not fully appreciating that it does not require the defendant to have had direct knowledge of the contract. Rather, the knowledge requirement is satisfied if the interfering party had knowledge of

"facts from which a reasonable person would conclude the existence of a contract." *Kelly v. Galveston County*, 520 S.W.2d 507, 513 (Tex. Civ. App. 1975). Second, Healix argues that the judge overlooked evidence showing that a reasonable person in Lackey's position would have known that the Clinic had a contract with Healix. Finally, Healix contends that the court erred in finding that Healix could not show causation, and it argues that it demonstrated that the Clinic broke its contract because HHI offered better terms.

Texas does not require a demonstration that the interfering party knew that a contract was in place; it is enough if a reasonable person in the party's position would have known about the contract. See *Kelly*, 520 S.W.2d at 513; *Armendariz v. Mora*, 553 S.W.2d 400, 406 (Tex. Civ. App. 1977). But Healix's argument that the district court erred in its application of the standard fails for several reasons. The first is that the argument was not properly before the district judge. Healix asked the judge to rule in its favor based either on HHI's actual knowledge of the contract or on the theory that HHI should have known about it because Healix filed a UCC financing statement. Healix did not argue to the district court that HHI should have known about the contract as a result of its knowledge of any facts or circumstances other than the financing statement. (One sentence in the closing argument implying that Lackey ignored information that might have caused him to discover the plans for construction of an in-office pharmacy is not sufficient.) An argument or legal theory not raised before the district court is forfeited. See *In re Willett*, 544 F.3d 787, 793 n.5 (7th Cir. 2008); *Domka v. Portage County, Wis.*, 523 F.3d 776, 783 n.11 (7th Cir. 2008); *Horn v. Transcon Lines, Inc.*, 7 F.3d 1305, 1308 (7th Cir. 1993).

And if Healix's argument had been raised before the district court, the result would have been the same. Healix's only evidence that HHI should have known about the contract was the financing statement: a record in a state office that contained the names and addresses of the Clinic and Healix, plus an account of the security interest as "office infusion center accounts receivables excluding Medicare and Medicaid accounts receivables." Healix argues that Lackey's knowledge of the infusion business should have led him to infer from this financing statement that the Clinic was building an in-office pharmacy, which in turn should have led him to infer that it had a contract with another infusion provider. See *Top Value Enterprises, Inc. v. Carlson Marketing Group, Inc.*, 703 S.W.2d 806, 810 (Tex. App. 1986); *Amigo Broadcasting, LP v. Spanish Broadcasting System, Inc.*, 521 F.3d 472, 490 (5th Cir. 2008). The problem is that the best evidence that Healix can produce to show that Lackey knew about the plan to construct a pharmacy is his failure to recall in perfect detail on the witness stand the substance of his pretrial declaration (which was silent regarding his knowledge of the plan). A few moments later, Lackey explicitly denied knowledge of the plan. The judge believed Lackey and so was right to reject this theory.

It is true that, when discussing the financing statement, the judge used the term "actual knowledge" rather than what a reasonable person in HHI's position should have known. That is unimportant because, if this was an error, it was harmless. Healix cites a Texas case that admonishes that "[o]nce put on notice [of a security agreement via a UCC financing statement], a third party must make inquiry to discover the complete nature of the agreement between the debtor and creditor." *Crow-Southland Joint Venture No. 1 v.*

*North Fort Worth Bank*, 838 S.W.2d 720, 724 (Tex. App. 1992). Healix takes this to mean that anyone who learns of a financing statement must stop and inquire about the nature of the underlying agreement. Either this, or any time two people form a contract, each must search to determine whether the other is encumbered by a competitor's security interest. Neither is accurate.

Filing a financing statement is one method of perfecting a security interest, which ensures a position superior to newcomers who wish to use the same asset to secure their own debt. See UCC §9–308, Official Comment 2. A filing statement tells the world who holds what interests in a given asset. Possession is another method, but filing statements allow more flexibility in the asset's use. See Douglas G. Baird & Thomas H. Jackson, *Possession and Ownership: An Examination of the Scope of Article 9*, 35 Stan. L. Rev. 175, 176 (1983). Wise creditors looking to use a particular asset as security for a debt look for a financing statement covering the asset, and, if one is in place, inquire into the nature of the agreement. Otherwise they risk ending up with a junior security interest. That's what happened in *Crow-Southland*, where a secured creditor foreclosed on a debtor's asset but had to turn the proceeds over to a senior creditor it had not discovered because its inquiry was not complete. See 838 S.W.2d at 724–25. There are no security interests at stake in this case, no dispute about priority in assets, and no claim that HHI ever saw the financing statement, so the fact that Healix filed it is irrelevant. Article 9 of the UCC does not cover disputes about tortious interference with contracts, and HHI has not cited any decision in Texas (or another state, for that matter) extending the role of financing statements beyond resolving claims of priority.

One final point about Healix's contention that the district judge erred in finding that HHI did not have actual knowledge. When arguing that the court used the improper standard, Healix refers exclusively to the court's oral statements immediately after the end of the trial. By contrast, we have been discussing the district judge's written opinion. Healix contends in a footnote of its brief that the oral remarks are what matter because the district court's opinion does not comply with Fed. R. Civ. P. 52. Rule 52(a)(1) obliges the court to "find the facts specially and state its conclusions of law separately." The court did so. The judge believed Keller, disbelieved Porter, and found the UCC financing statement to be unimportant. These findings led it to conclude that Healix had failed to meet its burden, so no more findings were required.

The Supreme Court has held that, to satisfy Rule 52, findings must be "sufficient to indicate the factual basis for the ultimate conclusion." *Kelley v. Everglades Drainage District*, 319 U.S. 415, 422 (1943) (interpreting both Rule 52(a) and a provision of the Bankruptcy Act containing similar language); see also *Bartsh v. Northwest Airlines, Inc.*, 831 F.2d 1297, 1304 (7th Cir. 1987) (stating that the rule's dual purposes are "(1) to provide appellate courts with a clear understanding of the basis of the trial court's decision, and (2) to aid the trial court in considering and adjudicating the facts"). The district court's opinion was not as elaborate as it could have been, but it satisfied the requirements of Rule 52(a)(1).

Because the district judge's written opinion is adequate, his oral remarks are unimportant. The judge was not announcing a criminal sentence. If he had been, the writing would have been no more than evidence of the sentence an-

nounced orally, and both pronouncements would be relevant. But whatever justifications exist for the criminal sentencing rule do not extend to judgments in civil suits. See *United States v. Cephus*, 684 F.3d 703, 709 (7th Cir. 2012), citing *United States v. Weathers*, 631 F.3d 560, 561–62 (D.C. Cir. 2011). In civil suits, the opinion and judgment are conclusive. As this court has recently noted, it would not like to be bound by its statements at oral argument rather than written opinions. See *In re Canopy Financial*, 708 F.3d 934 (7th Cir. 2013); see also *Okaw Drainage District of Champaign and Douglas County v. National Distillers and Chemical Corp.*, 882 F.2d 1241, 1244 (7th Cir. 1989) (noting the danger that an oral opinion may fail to identify and resolve all of a suit's issues). The district court deserves the same treatment.

In any event, the case can be disposed of on another ground. Keller held a majority membership interest in the Clinic. The district judge assumed that this entitled him to decisionmaking power, and Healix does not dispute this finding. Keller testified that the Clinic would have breached the Healix contract regardless of HHI's involvement, because securing financing for the in-office pharmacy would have been impossible. The district judge found Keller's statements to be credible. Healix does not challenge this finding, and it is enough to dispose of Healix's claim.

One element that Healix must prove is "that the willful and intentional act proximately caused damage". *ACS Investors, Inc.*, 943 S.W.2d at 430. Healix cites a number of cases in which courts have considered as evidence the fact that the interfering party offered better terms. See, e.g., *Davis v. HydPro, Inc.*, 839 S.W.2d 137, 139 (Tex. App. 1992); *John Paul Mitchell Systems, Inc. v. Randalls Food Markets, Inc.*, 17 S.W.3d

721, 731 (Tex. App. 2000). Whether an interfering party offered better terms can be evidence of the "active part" the party took in bringing about the breach, which Texas courts have found to be an element of cause. See *Davis*, 839 S.W.2d at 139. This court need not grapple with such questions. Healix's uncontroverted evidence demonstrates that the Clinic would have walked away from Healix no matter what HHI did. The causation inquiry ends there. See *Top Value*, 703 S.W.2d at 812. Healix needed to demonstrate that HHI was at fault in the breakup of the arrangement, and it cannot do so if the contract was doomed from the start.

AFFIRMED