# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-10589

United States Court of Appeals
Fifth Circuit

**FILED**

May 18, 2015

Lyle W. Cayce
Clerk

LINCOLN GENERAL INSURANCE COMPANY,

Plaintiff - Appellant Cross-Appellee

v.

U.S. AUTO INSURANCE SERVICES, INCORPORATED, CSI AGENCY
SERVICES, INCORPORATED; ALPHA PARTNERS, LIMITED

Defendants - Appellees Cross-Appellants

GAMMA GROUP, INCORPORATED,   JAMES DOUGLAS MAXWELL, also
known as Doug Maxwell; JAMES THORNTON MAXWELL, also known as
Jim Maxwell,

Defendants - Appellees

Appeals from the United States District Court
for the Northern District of Texas

Before DAVIS, DENNIS, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

A party that obtains a multimillion dollar judgment at trial usually leaves the courthouse happy. The Plaintiff in this case, Lincoln General Insurance Company, is an exception. After a bench trial, the district court awarded Lincoln $16.5 million on its tortious interference claims against CSi Agency Services, Inc. and Alpha Partners, Limited. The conduct that led to

No. 13-10589

that judgment involved the diversion of funds from a reinsurance arrangement involving insurer Lincoln and a claims administrator named U.S. Auto Insurance Services Company.

Despite being awarded a large judgment, it is Lincoln who raises the vast majority of ostensible errors in this cross appeal. Lincoln contends that the district court erred in dismissing other claims and Defendants before trial. The other claims are for breach of contract, breach of fiduciary duty, conversion, and derivative liability based on theories of alter ego and aiding and abetting. The Defendants are U.S. Auto, a number of affiliated companies, and Doug and Jim Maxwell, the father-son team associated with these entities.

The only error asserted by the parties who lost at trial, CSi and Alpha, is that the tortious interference claims are time barred.

## I.

This case arises from a complicated series of transactions often called "fronting arrangements" in the insurance industry.[1] A nonparty to this lawsuit, State and County Insurance Co. (S&C), fronted auto insurance policies. That means the policies were issued in S&C's name but it bore no risk. Lincoln was the party incurring the insurance risk as it reinsured 100% of S&C's liabilities under policies issued from 2003 through 2007. This departed from a previous agreement Lincoln signed with S&C in 2002, which allocated just 45% of the liabilities to Lincoln and the remainder to another reinsurer who is not involved in the current dispute.

U.S. Auto, a company entirely owned and operated by Doug Maxwell, served as the managing general agent for S&C pursuant to a General Agency

---

[1] This recitation of the facts comes from the factual findings of the district court, which are not challenged on appeal.

No. 13-10589

Agreement.  As managing general agent, U.S. Auto's responsibilities included issuing policies in S&C's name; collecting and handling the premiums paid by the insureds; and investigating, adjusting, and paying any claims.  The General Agency Agreement required U.S. Auto to set up a "Premium Trust Account" to manage the money from these various transactions, although U.S. Auto had the "privilege of retaining [its] commission[]" prior to depositing any collected money into the trust account.  U.S. Auto hired Gamma Group, Inc., another entity owned by Doug Maxwell, to assist with handling the claims. During the relevant time period, U.S. Auto's only business involved the auto policies issued by S&C and reinsured by Lincoln.

The agreements between the parties provided for the following.  As the nominal issuer of the policies, S&C would receive a small percentage off the top of the premiums collected.  U.S. Auto would receive 20.6% of what remained as compensation for its administrative work.  The parties anticipated that actual payouts on claims to the insureds—labelled "incurred losses"— would amount to 69.4% of the remaining collected premiums.  This percentage is the "target loss ratio."  As an incentive, U.S. Auto could receive an additional commission based on any amount the target loss ratio exceeded actual losses. In other words, if claims paid on the policies ended up being less than the anticipated 69.4% of premiums, U.S. Auto as the claims handler would receive that difference.  The remaining 10% of premiums was expected to go to Lincoln as its profit for bearing the risk.  Lincoln's actual receipt of its 10% margin thus depended on paid claims not exceeding the expected 69.4% figure; if claims paid exceeded that target loss ratio, the additional amount needed to pay claims would come out of the 10% otherwise owed to Lincoln.

Because the profit of the parties depended so heavily on the target loss ratio and the amount of incurred losses, the agreements detailed the

3

accounting techniques used to compute those numbers. One difficulty they addressed was the uncertainty in calculating incurred losses, which may be paid even after a policy has expired so long as the event triggering the claim occurred during the policy period. The formula to calculate incurred losses thus included an adjustment based on projected "incurred but not reported" losses. By making an adjustment for IBNR, the accounts would more accurately reflect the amount ultimately paid out for claims, and thus how much profit the parties would make.

As things turned out, actual losses for all relevant years fell below the target loss ratio of 69.4%. This should have resulted in all parties making money. Instead, Lincoln lost millions. The reasons why gave rise to this lawsuit.

During the first four years it acted as managing general agent, U.S. Auto transferred approximately $50 million to CSi Agency Services and Alpha Partners, two companies owned by Doug Maxwell and his father, Jim Maxwell. The transfers to CSi were purportedly made pursuant to a contract for the purchase of information technology and management services. No contract exists to support the transfers between U.S. Auto and Alpha. After receiving inflated management fees, Alpha and CSi distributed the money to Doug Maxwell and Jim Maxwell. All told, roughly $30 million flowed to Jim Maxwell and $20 million to Doug Maxwell.

Transfers of these vast sums would obviously lead to a shortfall at some point in the future. Doug Maxwell recognized this. But in reasoning reminiscent of a Ponzi scheme, he hoped that U.S. Auto would obtain funds through future business with other reinsurers that would allow it to replenish the depleted accounts needed to cover Lincoln's liabilities under the auto policies.

No. 13-10589

That future business never materialized and, by 2006, the Premium Trust Account ran out of funds to pay the claims for which Lincoln was liable. This required Lincoln to fund a zero balance account, which is so named because it automatically receives funds from another account when a check is presented for payment but does not otherwise receive funds (thus, the balance is always zero). U.S. Auto misused this zero balance account to pay 100% of the claims due under the 2002 agreement, even though Lincoln was only responsible for 45% of those liabilities.

In April 2007, U.S. Auto stopped issuing policies under the S&C name. It transferred all new business to Santa Fe Auto, another entity operated by Doug and Jim Maxwell. Around this same time, U.S. Auto "ran out of money" and "unilaterally" changed the formula used to calculate its commissions on the S&C policies for which Lincoln was on the hook. ROA 4566. As discussed previously, those additional commissions would be earned by U.S. Auto only if incurred losses fell below the 69.4% target loss ratio, and the agreements adjusted incurred losses upwards to accommodate for incurred but not reported losses. U.S. Auto removed incurred but not reported losses from the commission calculations, thereby creating the illusion of smaller incurred losses. This benefited U.S. Auto because it made the incurred loss ratio fall further below the target loss ratio, thereby inflating U.S. Auto's commission. But it came at Lincoln's expense, because when claimants eventually reported those losses, the money to pay them was not in the trust account.

In response to this conduct, Lincoln filed a lawsuit in 2007 against U.S. Auto, Gamma Group, Santa Fe, Alpha, CSi, Doug Maxwell, and Jim Maxwell. The parties agreed to settle in 2009, voluntarily dismissing the case without prejudice and signing a Memorandum of Understanding stating "[i]n the event that the parties are not able to complete all of the actions required under

5

this [agreement] . . . Lincoln's sole remedy shall be to refile the lawsuit." ROA 156.

Lincoln had to take that step as the settlement soon collapsed. S&C then assigned Lincoln its claims against U.S. Auto, which led to Lincoln asserting in this suit both its own claims and those of S&C.

The procedural history of this lawsuit is perhaps as convoluted as the parties' business relationships. Lincoln alleged several different causes of action against the Defendants, including breach of fiduciary duty, tortious interference with contract, misappropriation and conversion of funds, and liability based theories of alter ego and aiding and abetting. After the Defendants filed a motion to dismiss the claims relying on alter ego liability, Lincoln withdrew all those claims except the one against Doug Maxwell. On the Doug Maxwell claim, Lincoln filed a six-page response on the merits. The district court, however, granted the motion in its entirety, dismissing even the claim against Doug Maxwell on the belief that it was also withdrawn. Lincoln made no effort in the district court to correct this mistake. The amended complaint it later filed did not assert an alter ego theory of liability against Doug Maxwell.

After discovery, the parties filed cross motions for summary judgment. The district court partially granted the Defendants' motion, holding that: (1) the breach of fiduciary duty claims failed because none of the Defendants owed Lincoln a fiduciary duty; (2) the conversion claims failed because of the economic loss rule; and (3) the tortious interference claims against Gamma, Santa Fe, and Jim Maxwell failed because the evidence did not establish that they actively participated in any tortious conduct. Lincoln sought clarification of the grant of summary judgment on the fiduciary duty claims, inquiring whether that ruling included a holding that U.S. Auto and Doug Maxwell owed

No. 13-10589

no fiduciary duty to S&C, which had assigned its claims to Lincoln. The court responded by explaining its view that no duty was owed—to S&C or Lincoln—relating to the handling of the premiums before they were placed into the Premium Trust Account. That holding defeated the all the fiduciary duty claims because U.S. Auto's diversion of funds to the related entities occurred prior to the transfer of remaining premiums into the trust account.

After these summary judgment rulings, only the following claims remained for a bench trial: breach of contract against U.S. Auto and tortious interference against CSi and Alpha. Two noteworthy events took place before trial. First, the parties stipulated that U.S. Auto breached the contract by not paying Lincoln $16.5 million under the Reinsurance Agreements or General Agency Agreements,[2] so the trial would focus on the remaining claims for tortious interference. Second, just before trial, Jim Maxwell revealed the existence of a new entity called ZVN. ZVN apparently succeeded CSi and inherited CSi's liability. Though ZVN was not (and is not) a party to the present case, ZVN signed a stipulation agreeing that any judgment against CSi would be applicable to ZVN.

The district court then held a three-day bench trial. Because of the stipulation, the district court did not make a formal finding on Lincoln's breach of contract claim. It did find that Alpha and CSi tortiously interfered with the Lincoln–U.S. Auto contracts, which required a finding that U.S. Auto breached the agreements. The final judgment awarded Lincoln General $16.5 million—

---

[2] The parties stipulated to two facts: (1) that the amount of the reinsurance margin deficit under the agreements totaled $16.5 million, "a compromised figure," and (2) that this figure would define the "present amount that U.S. Auto owes Lincoln General." ROA 3558.

No. 13-10589

the damages for breach of contract specified in the stipulation—against Alpha and CSi on the claims for tortious interference.

Lincoln filed a motion to alter or amend the judgment in two respects. First, noting the stipulation on the breach of contract claim and the district court's own findings that U.S. Auto breached the contract, it requested the entry of judgment against U.S. Auto for $16.5 million. In their response, Defendants did "not dispute that the judgment apparently omitted a judgment against U.S. Auto." Lincoln's second request was to include a judgment against ZVN for $16.5 million because of the pretrial agreement that a judgment against CSi would apply to ZVN. The district court denied both requested amendments, reasoning that the parties reached an out-of-court settlement[3] on the breach of contract claim prior to trial and that it lacked the authority to enter judgment against a nonparty.

These cross appeals followed.

## II.

We first address the sole challenge CSi and Alpha raise to the $16.5 million judgment entered against them. They contend that Texas's two-year statute of limitations for tortious interference bars these claims. The operative date is November 27, 2005, because the first lawsuit was filed two years after that and the dismissal of the first suit included tolling agreement.

Many of the alleged tortious acts, most notably the transfer of premium funds to CSi and Alpha, started well before November 2005. CSi and Alpha contend that the date of these transfers is when the clock started running and

---

[3] The district court noted, however, that the "Plaintiff informed the Court prior to trial that it expected that the final judgment would still mention the breach of contract claim against U.S. Auto, despite the settlement." ROA 3808.

thus most of the tortious interference claims are time barred.[4]    But the premiums collected by U.S. Auto were able to cover all losses due under the insurance policies until late 2006.  Lincoln contends the claims thus did not accrue until this later time when the conduct directly affected its finances.  The limitations question turns on whether the tortious interference claim accrued when the diversion of funds took place or not until Lincoln had to use its own funds, rather than collected premiums, to pay claims.  The district court found the latter, holding that a legal injury did not occur until Lincoln was unable to pay all the losses on the claims.

Determining when the claims accrued presents a difficult issue of Texas law.  A cause of action for tortious interference with contract does not accrue until the plaintiff suffers actual damages or loss.  *See Holloway v. Skinner*, 898 S.W.2d 793, 795–96 (Tex. 1995).  Texas courts have hesitated to accept the notion that an act invades a legal interest merely because it eventually leads to financial harm.  *See Waxler v. Household Credit Servs.*, 106 S.W.3d 277, 280–85 (Tex. App.—Dallas 2003, no pet.) (holding that damages did not occur when the defendant wrongly listed the plaintiff as delinquent leading to negative credit reports, but only later when the plaintiff was denied credit).  But they have also understandably harbored doubts about a rule that requires plaintiffs to sit idly by while tortious conduct occurs, waiting for inevitable damage before they can bring suit.  *See Zidell v. Bird*, 692 S.W.2d 550, 557 (Tex. App.—Austin 1985, no writ) ("It is readily apparent from such decisions that harm to the plaintiff's legally protected interest, by reason of the

---

[4] The Defendants concede that some of the tortious acts occurred later.  Indeed, the district court found that some of the tortious acts occurred in 2007, well within the limitations period.  This later misconduct involved the change in commission calculations discussed previously and another transfer of funds.

defendant's earlier conduct, need not be finally established or an inevitable consequence of the conduct. Rather, the specific and concrete event which follows the defendant's conduct need raise only a risk of harm to that interest."). As we have noted before, "cases applying these rules have muddied the waters." *State Farm Life Ins. Co. v. Swift (In re Swift)*, 129 F.3d 792, 795–96 (5th Cir. 1997).

We can avoid making a difficult *Erie* guess on this issue in light of findings made by the district court that support application of the discovery rule. Although Lincoln never specifically invoked the discovery rule, the pretrial order recognized the following as a contested issue of fact for trial: "[Lincoln] knew or should have known U.S. Auto was making management fee payments to Alpha Partners and CSi between 2002 and 2005," the same payments allegedly outside the statute of limitations. ROA 3583. In its findings of fact (on the intent element of the tortious interference claim),[5] the district court found that Lincoln acted as a "very responsible and astute business[]," "could not have known" about the "wholesale removal of premium dollars [to Alpha and CSi]," and "filed a claim against the defendants *as soon as* it was clear that the behavior was . . . creating an injury." ROA 4603–04, 4606 (emphasis added). The district court later referred to these findings in discussing the statute of limitations issue. Admittedly, it is unclear to what extent the district court intended these findings to apply in the context of tolling the statute of limitations, as the district court did not need to address

---

[5] In the district court, the Defendants argued that "Lincoln General conducted several audits every year, which would have shown that U.S. Auto was paying large fees to Alpha for CSi's services from '02 to '05," and thus, "because Lincoln General knew what U.S. Auto was doing with its money but never complained of it, Lincoln General has no right to allege that tortious behavior occurred." ROA 4602–03. The district court made the findings relevant to the discovery rule in the course of rejecting that argument.

that issue in light of its finding that no legal injury occurred until 2007. Regardless, the district court found that Lincoln did not and could not have known of the facts giving rise to this cause of action until well within two years of the first lawsuit. That finding is sufficient to support application of the discovery rule. *See TIG Ins. Co. v. Aon Re, Inc.*, 521 F.3d 351, 357 (5th Cir. 2008). Although the Defendants complain that Lincoln failed to plead the discovery rule, such is unnecessary in federal practice when the parties have the notice provided by the pretrial order here that the discovery rule "might [be] assert[ed]." *Id.*

Even assuming that the district court did not make a formal finding about the discovery rule, we retain discretion to address the issue on appeal and judicial economy supports doing so. *See Am. Eagle Ins. Co. v. United Techs. Corp.*, 48 F.3d 142, 145 (5th Cir. 1995); *HECI Exploration Co. v. Holloway*, 862 F.2d 513, 519 (5th Cir. 1988). Critically, "additional factual development in the district court would not be necessary" on the legal question whether the discovery rule applies. *See id.; TIG*, 521 F.3d at 358. Additionally, it is less problematic to address an issue for the first time on appeal when it presents an alternative ground to affirm as opposed to a basis for reversal. *See Energy Dev. Corp. v. St. Martin*, 296 F.3d 356 (5th Cir. 2002) ("[I]n a narrow, well-defined class of cases, [a] defense . . . may be considered for the first time on appeal . . . to affirm the district court's judgment . . . if all of the relevant facts are contained in the record and are uncontroverted."). And, unlike the difficult question of state law presented by the accrual question, application of the discovery rule flows directly from facts found by the district court that are not clearly erroneous.

Based on the findings below that Lincoln did not and could not reasonably have known about its claims for tortious interference prior to the

No. 13-10589

premium funds being depleted, and that Lincoln filed suit as soon as it was able to discover the misconduct, we find that the discovery rule renders the claims against CSi and Alpha timely. The judgment on the tortious interference claim against CSi and Alpha is affirmed.

## III.

This brings us to the numerous issues Lincoln raises in its appeal. We will discuss them in the order they were decided in the district court.

### A.    Motion to Dismiss

Lincoln contends that the district court dismissed its claim asserting alter ego liability against Doug Maxwell based on the mistaken belief that it was withdrawing all its alter ego claims. Lincoln is correct. In response to the motion to dismiss, it voluntarily withdrew all of its alter ego claims with the exception of the one asserted against Doug Maxwell. Yet the district court dismissed all the alter ego claims (including the one against Doug Maxwell), and then gave Lincoln an opportunity to amend its complaint. Lincoln's problem, however, is it never notified the district court of this error and then filed an amended complaint that did not reassert alter ego liability against Doug Maxwell. The Defendants therefore contend that Lincoln abandoned this claim and cannot appeal the dismissal.

Whether a plaintiff forfeits the right to appeal dismissal of a claim omitted from a later amended complaint depends on the reason for dismissal. *See Wilson v. First Hous. Inv. Corp.*, 566 F.2d 1235, 1237–38 (5th Cir. 1978) *vacated on other grounds*, 444 U.S. 959 (1979). If the district court dismissed the claim on the merits or with prejudice, the plaintiff may appeal that ruling without needing to include the claim in a later amended complaint. *See, e.g.*, *Williams v. Wynne*, 533 F.3d 360, 365 (5th Cir. 2008). But if the district court dismissed the claim without prejudice because of a technical defect or

voluntary withdrawal, the plaintiff forfeits the right to appeal if it files an amended complaint omitting that claim. *See Wilson,* 566 F.2d at 1238 (citing 6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 1476 (1971 ed.) ("[A] party who amends his pleading . . . waives objections to that order insofar as it applies to rulings that [do not] strike a 'vital blow' to a substantial portion of [the] claim.") (quoting *Blazer v. Black,* 196 F.2d 139, 143–44 (10th Cir. 1952))). The interest in judicial efficiency explains the difference. Allowing appellate review when the dismissal was on the merits prevents a plaintiff from having to reassert rejected claims in an amended complaint, which would require the court to take the perfunctory step of issuing another dismissal order and potentially lead to sanctions being imposed on counsel for ignoring the court's earlier ruling. *Cf. Johnson ex rel. Wilson v. Dowd*, 345 F. App'x 26, 30 (5th Cir. 2009) (affirming sanctions against an attorney who reasserted dismissed claims in an amended complaint). In contrast, when the dismissal was based on a technical defect or withdrawal, an amended pleading provides an opportunity to correct the problem. The fault of not doing so rests with the plaintiff, and it is inefficient to require a new trial based on an error that was easily correctable if raised in the district court.

The mistaken dismissal of Lincoln's alter ego claim against Doug Maxwell falls on the nonmerit, correctable side of this divide. Accordingly, because Lincoln failed to reassert that liability theory in its amended pleading, it cannot appeal this issue.

### B.    Summary Judgment

#### 1.    Conversion

Lincoln appeals the district court's grant of summary judgment on its claims for conversion. Lincoln asserted that U.S. Auto and Sante Fe engaged

No. 13-10589

in: (1) conversion of funds by inflating the commission and by overpaying from the zero balance account, and (2) conversion of expiring policies by transferring them to Santa Fe.[6]  The district court held that the economic loss rule barred these claims.  Lincoln contends the economic loss rule does not apply because U.S. Auto had a legal duty not to convert the funds separate and apart from its contractual duties.  Lincoln alternatively argues that its claims are based in tort because the contracts created a special tort-based duty against conversion and the remedies it seeks exceed those available for breach of contract.

"Texas law has long distinguished tort liability from contract liability as between the parties to a contract, seeking to avoid the availability of both tort and contract liability for the same conduct and the same kind of harm or loss." *Nat'l Union Fire Ins. Co. v. Care Flight Air Ambulance Serv., Inc.*, 18 F.3d 323, 326 (5th Cir. 1994).  The economic loss rule flows from this distinction, and it generally prohibits a plaintiff from using a tort cause of action as a vehicle to impose liability for a claim based in contract.  Whether a claim is based in contract depends on the origin of the duty owed, the conduct that forms the basis for liability, and the nature of the resulting injury.  *See id.* (listing examples).  "The Texas Supreme Court has unequivocally adopted a broad interpretation of the economic loss rule."  *See Memorial Hermann Healthcare Sys., Inc. v. Eurocopter Deutschland, GMBH*, 524 F.3d 676, 678 (5th Cir. 2008) (citing *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986)).

Boiling this case down to its simplest terms, the conduct giving rise to liability arose from Lincoln entrusting property to U.S. Auto pursuant to the

---

[6] Although sued in the district court, Santa Fe is now in receivership and not a party to this appeal.

No. 13-10589

terms of a contract and the Defendants misappropriating that property. Several Texas cases have applied the economic loss rule to claims for misappropriating property entrusted under a contract.  To determine the origin of the duty breached and nature of the resulting injury, they examine the role of the contract in governing the use of the property.  *See Exxon Mobil Corp. v. Kinder Morgan Operating L.P.*, 192 S.W.3d 120, 126–28 (Tex. App.— Houston [14th Dist.] 2006) ("The very nature of the dispute between the parties was whether appellees legally performed their contractual obligations."); *Castle Tex. Prod. Ltd. P'ship v. Long Trusts*, 134 S.W.3d 267, 274 (Tex. App.— Tyler 2003) ("[I]f a contract spells out the parties' respective rights regarding a particular matter, the contract, not common law tort principles, governs any dispute about that matter.").  The economic loss rule generally bars a tort claim when no factual basis for the tort claim would exist had the defendant complied with the contract.  *See Exxon*, 192 S.W.3d at 128.  Thus, if the use of the property constituted misappropriation only because it breached the parties' contract, then a breach of contract action is usually the plaintiff's sole remedy.

That is the situation here.  The conversion claims based on inflation of the commission and transferring expiring policies stem from violations of contractual provisions.  The Reinsurance Agreement contains specific terms governing how to calculate the commissions and when to transfer expiring policies.  U.S. Auto's alleged use of the funds and policies would amount to misappropriation because U.S. Auto violated a duty specified in the contract. Had U.S. Auto calculated the commission and transferred the policies as required by the contracts, the factual predicate for a conversion claim would collapse.  Moreover, the injury suffered by Lincoln is the subject matter of the contract because it involved the same transactions contemplated by the

contract.  As such, the economic loss rule prevents Lincoln from bringing a tort claim.

The conversion claim based on misuse of funds in the zero balance account presents a more difficult question because the written agreements did not explicitly refer to this account, which was only created in 2006 after the shortfall of funds arose.  Nonetheless, this claim still depends on provisions in the parties' contracts.  Under the agreements, only 45% of each claim arising from a 2002 policy should have been paid out of the zero balance account, and U.S. Auto thereby misappropriated funds when it paid 100%.  Lincoln's claim for conversion thus depends on U.S. Auto having violated the terms of the reinsurance agreement.  Because a contract governs the allocation of funds paid out of the zero balance account, breach of contract is the only available cause of action for this alleged misconduct.

Neither of Lincoln's alternative arguments warrants a different result.  First, Lincoln contends that the contract imposes a separate common law duty against conversion because it says that U.S. Auto "shall not commingle" funds.  The usual rules of interpretation govern whether contract language imposes a common law duty against conversion.  There is no indication that the parties intended this language to impose liability for common law conversion, and the challenged conduct relates to diverting funds rather than commingling them.

Second, Lincoln contends that because it seeks the tort-based remedy of a constructive trust, its claims must be sound in tort.  This puts the cart before the horse.  The economic loss rule would have no teeth if a party could defeat it by requesting a tort-based remedy for liability arising from a contract.  Accordingly, the grant of summary judgment on Lincoln's conversion claims is affirmed.

16

### 2.     Breach of Fiduciary Duty

Lincoln next appeals the district court's grant of summary judgment on its claims for breach of fiduciary duty against U.S. Auto and Doug Maxwell. Lincoln contends that both the reinsurance agreements and Texas Insurance Code create fiduciary duties in calculating the commission and depositing the premiums.  Lincoln also asserts S&C's fiduciary duty claims based on the assignment of rights it received from S&C.

Although the district court seemed to acknowledge that U.S. Auto owed some duties related to the handling of premium funds,[7] it concluded that U.S. Auto's entitlement "to retain its commissions before depositing any excess into the Premium Trust Account" meant that "U.S. Auto was not acting in a fiduciary capacity" prior to transferring the funds into that account.  *Lincoln Gen. Ins. Co. v. U.S. Auto Ins. Servs., Inc.*, 892 F. Supp. 2d 787, 795 (N.D. Tex. 2012).  That eliminated the fiduciary duty claims in their entirety because the alleged misconduct is U.S. Auto retaining funds for itself and its related entities beyond what it was owed in commissions. These acts took place prior to U.S. Auto depositing the remaining premiums into the trust account.  After the summary judgment ruling, Lincoln asked the court to clarify whether it applied to the claim it had been assigned from S&C.  The district court clarified

---

[7] *See, e.g.*, *Lincoln Gen.*, 892 F. Supp. 2d at 795 ("[The contract] language merely reinforces the fact that U.S. Auto does not owe a general fiduciary obligation to Lincoln General, *but instead owes a fiduciary obligation to money that is deposited into the Premium Trust Account.*" (emphasis added)); *id.* at 796 ("[T]hese regulations make clear that *while U.S. Auto owes a fiduciary duty when holding money on behalf of State and County*, that duty is limited to instances when U.S. Auto deposits money into the Premium Trust Account" (emphasis added)).

No. 13-10589

that it did, based on the same reasoning that U.S. Auto did not owe any fiduciary duties to S&C prior to depositing the funds in the trust account.

### a.     U.S. Auto

The existence of a fiduciary duty is a question of law. *Nat'l Med. Enter. v. Godbey*, 924 S.W.2d 123, 147 (Tex. 1996) (citation omitted). A fiduciary relationship may be created by contract. *See Lindley v. McKnight*, 349 S.W.3d 113, 124 (Tex. App.—Fort Worth 2011, no pet.). However, because a fiduciary duty imposes obligations above and beyond the explicit terms of the contract, Texas courts "do not create such a relationship lightly." *See, e.g.*, *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997). Lincoln's arguments thus turn on the meaning of terms in the reinsurance agreements, which we construe by applying the ordinary rules of contract interpretation. *See id.*; *McAfee, Inc. v. Agilysys, Inc.*, 316 S.W.3d 820, 829 (Tex. App.—Dallas 2010, no pet.) (construing the parties' contract to determine if they had entered into a fiduciary relationship).

### i.     S&C's Claims

The district court misinterpreted the scope of the fiduciary duty imposed by the reinsurance agreements. The General Agency Agreement states that U.S. Auto owed S&C a fiduciary duty in virtually all transactions related to the premiums:

> The Agent [U.S. Auto] shall accept and maintain at all times all premiums collected and other funds relating to the business written under this Agreement as a fiduciary for [S&C]. The privilege of retaining commissions shall not be construed as changing the fiduciary capacity.

This imposed a fiduciary duty on U.S. Auto that encompassed collecting, handling, spending, deducting from, and depositing the premiums. The broad

18

language defining the boundaries of this fiduciary duty—maintaining "all premiums" at "all times"—is without qualification. Such language required U.S. Auto to handle all funds as a fiduciary from the moment it accepted them until the time they left its control—a period including when it calculated commissions, made deductions, and ultimately deposited the remaining premiums. The expansive contractual language is consistent with a provision in the Texas Insurance Code stating that "[a] managing general agent holds money on behalf of an insured or insurer in a fiduciary capacity." TEX. INS. CODE § 4053.106. Indeed, control over funds belonging to others is the classic situation in which a fiduciary duty arises. *Pegram v. Herdich*, 530 U.S. 211, 231 (2000) ("At common law, fiduciary duties characteristically attach to decisions about managing assets and distributing property to beneficiaries.").

As the plain language of the provision states, U.S. Auto's "privilege of retaining commissions" does not alter this analysis. The district court imposed too narrow a duty by holding that fiduciary duties arose only after U.S. Auto retained its commissions and deposited funds in the trust account. In addition to contradicting the contract's broad language, imposing such a narrow duty would eviscerate the fiduciary obligations concerning the funds. U.S. Auto could simply avoid liability by misappropriating all the premium funds before making deposits into the trust account. The district court thought Texas Insurance Code provisions requiring managing general agents to maintain escrow accounts mean that no fiduciary duties exist prior to the funds being deposited in the escrow account. Those provisions do the opposite, however, recognizing that agents can siphon funds just as easily—and perhaps in a manner more difficult to detect—before they end up in the account. TEX. INS. CODE.§ 4053.105(c) ("[A] managing general agent may not use, take as an

No. 13-10589

offset, or convert money that is *or should have been* deposited in the escrow account." (emphasis added)).  The ruling that U.S. Auto owed no fiduciary duty with respect to premiums until it transferred the funds to the trust account thus contravenes the terms of the agreement and the fiduciary protections the parties intended.

U.S. Auto contends that we should nevertheless affirm dismissal of the assigned S&C claim on the alternative ground that S&C, unlike Lincoln, did not suffer any damages (S&C was paid its 2% fee).  We think the better course is to allow the district court to consider the damages issue in the first instance. Lincoln requested a constructive trust over the profits U.S. Auto received, which is a remedy that may be available for breach of fiduciary duty.[8]  *See Meadows v. Bierschwale*, 516 S.W.2d 125, 128–29 (Tex. 1974); *Chien v. Chen*, 759 S.W.2d 484, 494 n.6 (Tex. App.—Austin 1988, no writ) ("Equitable remedies, such as . . . the imposition of a constructive trust, may be awarded for breach of the higher standards of conduct demanded in the fiduciary relationship.").  That remedy does not require actual damages.  *See Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942) ("It would be a dangerous precedent for us to say that unless some affirmative loss can be shown, the person who has violated his fiduciary relationship with another may hold on to any secret gain or benefit he may have thereby acquired."); *see*

---

[8] Lincoln appears to have satisfied the pleading requirement to obtain such relief by explicitly requesting a constructive trust in its complaint. *See Lee v. Lee*, 47 S.W.3d 767, 780–81 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (holding that the plaintiff must prove actual damages if it fails to request equitable relief); *see also Tisino v. R&R Consulting & Coordinating Grp., LLC*, 478 F. App'x 183, 185 (5th Cir. 2012) (holding that a "complaint, which asserts a breach of fiduciary duty claim and requests imposition of a constructive trust" provides sufficient notice (internal quotation marks omitted)).

No. 13-10589

*also ERI Consulting Engineers, Inc. v. Swinnea*, 318 S.W.3d 867, 874 (Tex. 2010) ("[W]here a fiduciary takes advantage of his position of trust to induce a principal to enter into a contract[,] [t]he remedy of forfeiture is necessary to prevent such abuses of trust, *regardless of proof of actual damages*." (emphasis added)); *Burrow v. Arce*, 997 S.W.2d 229, 240 (Tex. 1999) ("[A] client *need not prove actual damages* in order to obtain forfeiture of an attorney's fee for the attorney's breach of fiduciary duty to the client." (emphasis added)).

The parties therefore may fully litigate the merits of S&C's fiduciary duty claims on remand. The grant of summary judgment on S&C's fiduciary duty claim—asserted by Lincoln as a result of the assignment—is reversed.

### ii.    Lincoln's Claims

We next turn to whether U.S. Auto owed these same fiduciary duties directly to Lincoln. The district court did not focus on this issue given its ruling that any duty, even that owed to S&C, did not extend to mishandling of premiums prior to them being deposited in the trust account. The parties spend much of their briefs arguing whether a duty was owed to Lincoln under either the common law, the Insurance Code, or the parties' agreements.

Once again, we find that the Reinsurance Agreement answers the question:

> In connection with this Agreement, [S&C] and the Agent [U.S. Auto] have entered into the Agency Agreement. [Lincoln] has selected the Agent [U.S. Auto] to administer the business reinsured hereunder. While for regulatory purposes, the Agent [U.S. Auto] will need to be appointed as [S&C's] agent, it is recognized that *the Agent [U.S. Auto] is acting on behalf of [Lincoln].*

21

No. 13-10589

ROA 743 (emphasis added). In addition, the General Agency Agreement states in the specific context of handling premiums that U.S. Auto is acting as Lincoln's agent:

> [S&C], at [Lincoln's] request, further authorizes the Agent [U.S. Auto] to perform all acts and duties under policies of insurance issued by [S&C] as would otherwise be performed by [S&C], including . . . remitting and/or receiving monies due from or to [S&C], and adjusting and paying losses or other claims. . . . In performing each of the acts mentioned above, *the Agent [U.S. Auto] shall be under the direct supervision and control of [Lincoln General]*, and [Lincoln] shall be solely responsible for the acts of the Agent [U.S. Auto].

ROA 759 (emphasis added).

These provisions recognize the obvious: given S&C's limited role as the fronting entity, it is Lincoln that has an interest in the premium funds as only it is liable for paying claims. With respect to the handling of premium funds, the agreement thus sensibly extends the duties owed the nominal beneficiary of U.S. Auto's fiduciary role (S&C) to the party actually affected by those fiduciary decisions (Lincoln).

U.S. Auto contends that *National Plan Administrators, Inc. v. National Health Insurance Co.*, 235 S.W.3d 695 (Tex. 2007), supports its argument that it does not owe a fiduciary duty to Lincoln. Although the Supreme Court of Texas in that case found no general fiduciary duty that would have governed the plan administrator's marketing of policies to other insurers, it also recognized that the parties' contract imposed specific fiduciary duties. Notably, those included duties relating to the handling of claims. *Id*. at 702–03. The parties' agreements in this case also are the source of the fiduciary duty we have recognized, and it is a specific one that that involves U.S. Auto's

22

conduct in "accept[ing] and maintain[ing] at all times all premiums collected and other funds relating to the" policies. Because Lincoln's breach of fiduciary duty claim against U.S. Auto relies on that specific duty governing management of funds and not a general one that would apply to all business activity, the grant of summary judgment on this claim is reversed.

### b.     Doug Maxwell

Lincoln also brought claims for breach of fiduciary duty against Doug Maxwell in his individual capacity. Recall that Doug Maxwell is the sole officer, director, and shareholder of U.S. Auto. He also owns roughly 40% of CSi and serves as an officer and director; and has a 39.6% partnership interest in Alpha. Just as it did against U.S. Auto, Lincoln first asserts S&C's claims for breach of fiduciary duty. The district court acknowledged Maxwell's admission that he "was appointed as a managing general agent by State and County with respect to business produced under the Reinsurance Agreements," but granted summary judgment for the same reason it did so on S&C's claim against U.S. Auto—the mistaken belief that the fiduciary duty arose only after U.S. Auto deposited premiums in the trust account. ROA 3385. We therefore reverse this ruling for the reasons already discussed.

Next, Lincoln asserts that Doug Maxwell directly owed Lincoln a fiduciary duty based on a common law agency relationship or the Texas Insurance Code. The district court also granted summary judgment in favor of Doug Maxwell on this claim.

We have doubts about whether this issue has any remaining practical effect on this litigation in light of our other holdings allowing fiduciary duty claims to be asserted against Doug Maxwell on remand. Those are the assigned claim of S&C just discussed and the soon-to-be-discussed claim

asserting that Doug Maxwell aided and abetted U.S. Auto's breach of fiduciary duty.  It is unlikely that the outcome of those claims would differ than the outcome of a claim asserting that Doug Maxwell owed a fiduciary duty directly to Lincoln.  Moreover, it is unclear how the district court's prior dismissal of this claim is affected by our ruling that fiduciary duties existed prior to deposit of the funds in the trust account.  As such, we find it appropriate remand this claim for further consideration.  If Lincoln still sees the need to assert it, the district court can evaluate its viability based on our other rulings.

### 3.    Aiding and Abetting

Lincoln also seeks to impose individual liability—this time for both Doug and Jim Maxwell—on an aiding and abetting theory.  The district court granted summary judgment on these claims only because of its holding that U.S. Auto did not owe fiduciary duties prior to depositing the premiums in the trust account.  As we concluded otherwise, the grants of summary judgment on the aiding and abetting breach of fiduciary duty claims are reversed.

### 4.    Lincoln's Cross-Motion for Summary Judgment

The final issue on the fiduciary duty claims is Lincoln's argument that it is entitled to summary judgment on the breach element in the event we find—and we have—that U.S. Auto owed a fiduciary duty.  Lincoln contends that its summary judgment evidence was similar to the evidence presented at trial which led to the finding of tortious interference against CSi and Alpha.  Tortious interference on these facts, Lincoln says, is not much different than a breach of fiduciary duty.

Although we conclude that U.S. Auto's fiduciary duty encompassed the handling of funds even prior to their deposit in the trust account, we do not find that Lincoln is entitled to summary judgment as to the breach issue.  In

its briefs, Lincoln primarily cites evidence not included in the summary judgment record. "[O]ur review is confined to an examination of materials before the lower court at the time the [summary judgment] ruling was made; subsequent materials are irrelevant." *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988). U.S. Auto is entitled to defend this claim at trial. The summary judgment evidence does not establish breach of fiduciary duty as a matter of law.

### 5.    Tortious Interference

That brings us to the tortious interference with contract claims. This is the claim on which Lincoln prevailed at trial against CSi and Alpha. With respect to defendants Gamma and Jim Maxwell, however, the district court granted summary judgment in the Defendants' favor. Lincoln challenges only the dismissal of the claim against Jim Maxwell.[9]

Lincoln alleged that Jim Maxwell intentionally interfered with the reinsurance agreements by causing the transfer "of all or virtually all of U.S. Auto's net revenues to CSi and Alpha," *Lincoln Gen.*, 892 F. Supp. 2d at 803, with those entities then transferring about $30 million of those funds to him. The district court concluded that the summary judgment evidence did not show that Maxwell took an "active role" in any interference. *Id.*

Lincoln first argues that the district court erred in imposing an "active participation" standard for a tortious interference claim. It points out that the Supreme Court of Texas has not expressly listed "active participation" as a separate element of a claim for tortious interference. *See Holloway,* 898 S.W.2d

---

[9] Lincoln briefly mentions the tortious interference claim against Gamma, but does not sufficiently raise that issue on appeal to warrant our review.

No. 13-10589

at 795–96.    Similarly, Texas intermediate courts have held that active participation is not an element of tortious interference. They do, however, require proof of it to establish proximate cause. *See Davis v. HydPro, Inc.*, 839 S.W.2d 137, 139 (Tex. App.—Eastland 1992) ("[T]he 'active part in persuading a party to a contract to breach it' is part of the proximate cause requirement [of a tortious interference claim]." (citing *Texaco v. Pennzoil*, 729 S.W.2d 768, 803 (Tex. App.—Houston[1st Dist.] 1987, writ ref'd n.r.e.)).    We have followed those intermediate decisions before, and because Lincoln cites no Texas authority indicating that the law has changed, we will do so again here. *See Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 493 (5th Cir. 2008) ("To establish proximate cause [for a tortious interference claim], a party must show that 'the defendant took an active part in persuading a party to a contract to breach it.'"); *see also Healix Infusion Therapy, Inc. v. Heartland Home Infusions, Inc.*, 733 F.3d 700, 705 (7th Cir. 2013) ("Whether an interfering party offered better terms can be evidence of the 'active part' the party took in bringing about the breach, which Texas courts have found to be an element of cause.").

Even under the "active participation" standard, however, the summary judgment evidence permits a finding that Jim Maxwell engaged in tortious conduct.    In denying summary judgment on this claim as to Alpha and CSi, the district court noted that "Doug Maxwell owned a large share of both entities." *Lincoln Gen.*, 892 F. Supp. 2d at 803.    Similar reasoning should also apply to Jim Maxwell as he owns an even greater share of both entities (59.4% of Alpha

26

and 60% of CSi);[10] admitted that he ran the daily operations of CSi and also had involvement in Alpha's decisionmaking; made the decision along with his son to make the transfers; and personally pocketed $30 million, *cf. Holloway*, 898 S.W.2d at 798 (considering the financial motives of the defendant in deciding whether tortious interference took place).

Given the significant overlap between the conduct of Alpha, CSi, and Jim Maxwell, the same evidence that warranted denying summary judgment to CSi and Alpha also warranted denying summary judgment to Jim Maxwell. Accordingly, the district court's grant of summary judgment on the tortious interference claim against Jim Maxwell is reversed.

### C.     Motion to Alter or Amend the Judgment

The final issues we address relate to Lincoln's unsuccessful attempts to amend the judgment. "Denial of a Rule 59(e) motion to amend or alter a judgment is generally reviewed for abuse of discretion. Issues that are purely questions of law are, however, reviewed *de novo*." *Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 405 (5th Cir. 2002) (citation omitted). A district court abuses its discretion if it bases its decision on "a clearly erroneous assessment of the evidence." *Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir. 2005).

---

[10] The district court appears to have mixed up the Maxwells when it stated that Jim owned 39.6% of Alpha. *Lincoln Gen.*, 892 F. Supp. 2d at 803 n.12. This mistake is understandable given that one is named James Douglas Maxwell and goes by Doug, and the other is named James Thornton Maxwell and goes by Jim. Indeed, the Defendants' own attorneys appear to have made the same mistake in their district court briefing. Review of the Maxwells' affidavits, the joint pretrial order, and the findings of fact all show that Jim Maxwell in fact owned roughly 60% of both Alpha and CSi.

No. 13-10589

### 1.     Breach of Contract

Lincoln appeals the district court's failure to enter a $16.5 million judgment against U.S. Auto for breach of contract.  After trial, the Defendants did not contest entering final judgment against U.S. Auto for breach of contract based on the parties' pretrial stipulation.  The district court refused to do so based on its belief that the parties had entered into an out-of-court settlement.  However, the parties had entered into an unusual pretrial stipulation of both liability and damages on the breach claim against U.S. Auto that they anticipated would be reflected in the judgment.  The district court thus abused its discretion by refusing to alter or amend the judgment to include the jointly requested judgment against U.S. Auto.  The district court is instructed to enter judgment on the breach of contract claim as previously requested by Lincoln.

### 2.     Judgment against nonparty ZVN

After trial, Lincoln also sought entry of judgment against ZVN pursuant to ZVN's stipulation that any judgment against CSi would also bind ZVN.  The district court denied Lincoln's motion on the grounds that ZVN was not a party.

Lincoln argues that final judgment may be entered against a nonparty when the party (1) has an identical interest in the litigation, (2) was not revealed until just before trial, and (3) signed a stipulation agreeing to be bound by any judgment.  Lincoln derives this test from *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 110 (1969), in which the Court held that final judgment could not be entered against a nonparty even though the nonparty's attorney signed a stipulation to the contrary.  The key difference in this case, Lincoln argues, is that the entity itself (rather than its attorney) executed the stipulation.  Lincoln extracts the other elements of its test from Rule 21, which permits joinder of defendants "at any time" so long as it is on

No. 13-10589

"just terms." *See* Fed. R. Civ. P. 21. Still to this day, however, Lincoln has never moved to join ZVN as a party, it just asked to have ZVN included in the judgment as a liable party.

"It is elementary that one is not bound by a judgment in personam resulting from litigation in which he is not designated as a party or to which he has not been made a party by service of process." *In re Liljeberg Enterprises, Inc.*, 304 F.3d 410, 468 (5th Cir. 2002) (quoting *Zenith Radio*, 395 U.S. at 110 (citing *Pennoyer v. Neff*, 95 U.S. 714 (1878))). Lincoln has not convinced us to upset this clear rule that governs this situation. To the extent ZVN entered into a valid contractual agreement that it would be liable for any judgment against CSi, Lincoln will have to pursue that contract claim in a separate case in which ZVN is a party and has the right to defend itself. Accordingly, the denial of the motion to alter the judgment to include ZVN is affirmed.

**IV.**

Even for a commercial case arising from complicated transactions, this lawsuit stands out for the number of parties and claims involved. Although we remand a number of claims for trial, a litigation strategy with a narrower focus on certain claims and Defendants might reduce the complications, both procedural and substantive, that arose the first go-around.

A summary of our numerous rulings is in order. We AFFIRM the following: (1) the judgment entered against CSi and Alpha; (2) the grant of summary judgment on Lincoln's conversion claims; (3) the denial of Lincoln's cross-motion for summary judgment on its fiduciary duty claims; and (4) the denial of the motion to alter the judgment to include ZVN. We further hold that Lincoln forfeited the right to appeal the dismissal of its claims against Doug Maxwell asserting alter ego liability. We REVERSE the following

29

rulings (1) the refusal to alter the judgment to include Lincoln General's breach of contract claim against U.S. Auto; (2) the grant of summary judgment on all the fiduciary duty claims that Lincoln appealed, including the claims for aiding and abetting; and (3) the tortious interference claim against Jim Maxwell. The case is REMANDED for further proceedings consistent with this opinion.